UNITED STATES, Appellant and Cross-Appellee,

v.

Frederick V. LEDBETTER, Staff Sergeant, U. S. Air Force, Appellee and Cross-Appellant.

No. 31,436.
ACM 21878.

U. S. Court of Military Appeals.

Oct. 22, 1976.

*Major Bruce R. Houston* argued the cause for Appellee, Accused. With him on the brief was *Colonel Jerry E. Conner.*

*Colonel Julius C. Ullerich, Jr.,* argued the cause for Appellant, United States. With him on the brief was *Captain Rex L. Fuller, III.*

## Opinion of the Court

FLETCHER, Chief Judge:

On the 88th day of post-trial confinement following his conviction by general court-martial for larceny of Government property and conspiracy to commit larceny, the accused's second request for deferment[1] of his sentence[2] abruptly was "reconsidered" and was granted by the convening authority. Over a month later the accused was reconfined, 124 days after his trial ended.

The date of this "deferment rescission" co-incided with the date of the convening authority's action approving the findings and so much of the sentence as provided for confinement at hard labor for 1 year and forfeiture of $200.00 pay per month for 12 months.[3]

### I

Appellate defense counsel suggest that "it requires no clairvoyance to recognize that the sole and obvious purpose" in releasing the accused from confinement was to avoid the consequences spelled out in *Dunlap v. Convening Authority*, 23 U.S.C.M.A. 135, 138, 48 C.M.R. 751, 754 (1974):

[A] presumption of a denial of speedy disposition of the case will arise when the accused is continuously under restraint after trial and the convening authority does not promulgate his formal and final action within 90 days of the date of such restraint after completion of trial. In the language of *Burton*, "this presumption will place a heavy burden on the Government to show diligence, and in the absence of such a showing the charges should be dismissed."

Urging that the *Dunlap* standard still should be applied, the accused contends that the convening authority unlawfully deferred his sentence and otherwise was without authority to release him temporarily from confinement.

Rather than a bad faith attempt to subvert the spirit of the *Dunlap* rule, the Government suggests that the accused "re-quest was denied, the convening authority unilaterally reconsidered the request and approved it.

---

1. Article 57(d), Uniform Code of Military Justice, 10 U.S.C. § 857(d), provides, in pertinent part, "On application by an accused who is under sentence to confinement that has not been ordered executed, the convening authority . . . may in his sole discretion defer service of the sentence to confinement. The deferment shall terminate when the sentence is ordered executed. The deferment may be rescinded at any time by the officer who granted it".

2. The accused twice requested that his adjudged confinement be deferred, once immediately following trial and again two months after trial. Both requests were promptly denied. Three weeks after the second deferment re-

3. In sentencing the accused to confinement at hard labor for 1 year, forfeiture of $300.00 pay per month for 12 months, and reduction to the grade of sergeant, the trial judge "strongly urged" the convening authority to take the necessary action to assure that the accused was not automatically reduced to the lowest enlisted grade. *See* Article 58a, UCMJ. No such action was taken. In fact, the convening authority denied the trial judge's request for an appointment to discuss the matter.

ceived the benefit intended by *Dunlap*" and that the convening authority's order releasing the accused from confinement until he acted on the case accomplished the "intent of *Dunlap* . . . to protect a convicted person from being restrained for an undue time after trial before an authoritative determination of the status of his case is made at the initial appellate level."

■ In resolving this question below, the Air Force Court of Military Review observed: [4]

> As we view the *Dunlap* mandate, it establishes a precise, mechanical rule, the invocation of which does not become effective unless and until the post-trial restraint in a case exceeds 90 days and final action has not been promulgated by the convening authority. *See United States v. Slama*, 23 U.S.C.M.A. 560, 50 C.M.R. 779, 1 M.J. 167 (1975). The undisputed facts in this case show that the accused was in post-trial confinement only 88 days from the conclusion of the trial to the final action of the convening authority. Thus, the *Dunlap* rule simply does not apply here regardless of the vehicle that effected the accused's release from confinement.

For purposes of the *Dunlap* rule, appellate defense counsel's challenge to the

power of the convening authority to "re-review" his action in denying the second request for deferment and to grant a deferment effective 4 June 1975 is of no moment. The fact remains that the accused was not in continuous post-trial restraint in excess of 90 days and, therefore, the *Dunlap* rule did not become operative.

The Court at this time is unwilling to further tighten the *Dunlap* standard, as urged by appellee's counsel, thereby eliminating one of the few remaining safety valves available to those charged with the administration of military justice at the trial level.[5] However, when *Dunlap* forces a convening authority to release an individual from post-trial restraint, whom he believes should have remained confined, such a circumstance is an indicator of *serious* defects in that command's procedures for administering the Uniform Code of Military Justice. Where such a drastic step is necessary to avoid dismissal of the charges, a convening authority is well advised to implement curative procedures and take such other steps as are necessary to remedy the situation.

## II

■ In a related context, the Judge Advocate General has certified the question

---

4. *United States v. Ledbetter*, 1 M.J. 746 (A.F. C.M.R.1975).

5. It is regrettable that efforts by this Court to fashion guidelines with some flexibility invariably prompt more, rather than less, litigation. The ultimate, and I believe unfortunate, result is subsequent decisions which solidify a standard with little, if any, discretion left to those who must apply it. *See, e. g., United States v. Henderson*, 1 M.J. 421 (1976); *United States v. McOmber*, 1 M.J. 380 (1976); *United States v. Jordan*, 1 M.J. 334 (1976); *United States v. Hughes*, 1 M.J. 346 (1976). *Dunlap* sought to establish a guideline for the *timeliness* of criminal proceedings. *See AFCMR Sanctions Deliberate Avoidance of Dunlap*, 3 Mil.L.Rep. 1121 (1975). Although the *Dunlap* decision was bottomed on Article 10, UCMJ, a careful reading of that statute suggests that the opinion has more firm roots in a supervisory authority concept, that is to say, this Court's obligation to assure that the military justice system operates

both fairly and efficiently as Congress intended. It scarcely needs repeating that justice delayed is, indeed, justice denied. Such a blatant attempt to avoid the speedy disposition standard enunciated in *Dunlap*, as is evidenced in this case, would prompt me to close the perceived confinement "loophole." My brothers are unwilling to take that step *at this time*; however, those charged with administering the military justice system are forewarned of the continuing risks associated with falling into the last minute release syndrome utilized here. *See United States v. Player*, 2 M.J. 1115, 1117 (C.G.C.M.R.1975) (Lynch, J., concurring). As one commentator recently put it: "to persist with business as usual . . . is to step into the batter's box with one strike against the government and no 'book' on what kinds of pitches the other two judges will throw." Cooke, *United States v. Thomas and the Future of Unit Inspections*, The Army Lawyer, July 1976, at 1, 3.

whether the Court of Military Review was correct in holding that the action of the convening authority in deferring the accused's confinement was improper and that the accused was entitled to credit for confinement during the period of June 4, 1975, to July 10, 1975. Specifically, the Air Force Court opined: [6]

> The question remains: was there an effective grant of deferment on 4 June 1975 thereby postponing the running of the sentence to confinement until its later rescission on 10 July 1975? We think not. Clearly, the deferment of a sentence to confinement can be undertaken only upon application of an accused. Article 57(d), Uniform Code of Military Justice. While the convening authority is given "sole discretion" in granting a deferment and may rescind it at any time, we believe it would be an unreasonable interpretation of Article 57(d) to conclude that a request can be held in abeyance indefinitely without action or that a previously denied request can be "re-reviewed" and reversed, *sua sponte*, at a much later time. Once action is taken denying a request, we believe it then becomes the prerogative of the accused to make a new application for deferment or request a reconsideration of a previous denial. At a later date he may no longer desire to postpone the running of the sentence to confinement, and it seems to us that Article 57(d) intends to give him the option of initiating the procedure.

Again, we believe the Court of Military Review's reasoning is sound. While there is no statutory bar to a commander's ordering an individual out of confinement at any time for any or no reason, that does not end the inquiry here. *Cf. Reed v. Ohman*, 19 U.S.C.M.A. 110, 41 C.M.R. 110 (1969); *Levy v. Resor*, 17 U.S.C.M.A. 135, 37 C.M.R. 399 (1967). Article 57(b) structures a confine-

ment credit scheme which does not require that the accused necessarily be incarcerated to receive confinement credit: "Any period of confinement included in a sentence of a court-martial begins to run from the date the sentence is adjudged by the court-martial, but periods during which the sentence to confinement is suspended or deferred shall be excluded in computing the service of the term of confinement." [7] Thus, once confinement is adjudged, only if it is then "suspended or deferred" does the accused not receive confinement credit. Whether he actually is confined is irrelevant under the language of the statute.

Article 57(d) specifies under what conditions a sentence may be deferred. Unilateral reconsideration of a deferment request is, we believe, contrary to the spirit of the congressional scheme which places the right to initiate such requests in the accused. As the Court of Military Review stressed, timing is an essential element in deciding whether to request a deferment. Thus, once a deferment request is considered and denied, the accused must again request a deferment before a release from confinement qualifies as such and thereby tolls the running of the confinement portion of the adjudged sentence under Article 57(b). The Court of Military Review properly credited the accused for confinement between June 4, 1975, and July 10, 1975.

### III

■ Following receipt of a post-trial memorandum from the trial judge in this case, this Court specified the question whether the military judge was subjected to unwarranted command control in violation of Article 37, UCMJ, allegedly based upon his imposition of lenient sentences in three cases, one of which was the accused's.[8] Appended to this decision is the

---

6. *United States v. Ledbetter, supra*, 1 M.J. at 748.

7. *See Noyd v. Bond*, 395 U.S. 683, 691–92, 89 S.Ct. 1876, 23 L.Ed.2d 631 (1968); *Reed v. Ohman*, 19 U.S.C.M.A. 110, 41 C.M.R. 110 (1969).

8. Appellee also has challenged the impartiality of the staff judge advocate and convening authority as a result of Judge Paul's allegations. Even assuming the truth of the trial judge's assertions, a post-trial disagreement as to the appropriateness of the adjudged sentence is an

initial memorandum of the trial judge as well as a document in which he later responded to specific questions of appellate defense counsel. In addition, affidavits of the Judge Advocate General of the Air Force, the former Chief of the Air Force Trial Judiciary, the Assistant to the Chief of the Air Force Trial Judiciary, and the Staff Judge Advocate of the 13th Air Force responding to Judge Paul's allegations of misconduct have been reproduced.

Appellate government counsel have likened the inquiries mentioned in the appellate exhibits to those of an independent investigatory commission as recommended by the American Bar Association.[9] The Government further contends that all trial judges' actions "must be subject to scrutiny" by the Judge Advocate General since these judges have been removed "from the normal chain of command in the military services and placed . . . under the control of the respective Judge Advocate General."[10] Nevertheless, the Government acknowledges that Congress, in adopting Articles 26(c) and 37(a) of the Uniform Code, sought to insulate judges, as well as others involved in the court-martial process, from command interference with the deliberative process. Article 37(a) expressly provides:

> No person subject to this chapter may attempt to coerce or, by any unauthorized means, influence the action of a court-martial . . . or any member thereof, in reaching the findings or sentence in any case.

■ The trial judge, as an integral part of the court-martial,[11] falls within the mandate of Article 37. If anything is clear in the Uniform Code of Military Justice, it is the congressional resolve that both actual and perceived unlawful command influence be eliminated from the military justice system. Article 26(c)'s provision for an independent trial judiciary responsible only to the Judge Advocate General certainly was not designed merely to structure a more complicated conduit for command influence. That is to say, the Judge Advocate General and his representatives should not function as a commander's alter ego but instead are obliged to assure that *all* judicial officers remain insulated from command influence before, during, and after trial.

---

insufficient basis upon which to disqualify the staff judge advocate and convening authority. Predisposition is the evil which triggers disqualification. *United States v. Engle*, 1 M.J. 387 (1976); *United States v. Sierra-Albino*, 23 U.S.C.M.A. 63, 48 C.M.R. 534 (1974); *United States v. Diaz*, 22 U.S.C.M.A. 52, 46 C.M.R. 52 (1972). Here, any expression with regard to the appropriateness of the sentence came during the proper time frame for making that determination. Whether such expressions are otherwise appropriate is another matter; however, they are not disqualifying.

**9.** ABA Standards, The Function of the Trial Judge § 9.1(a) (1972), provides:

> Each jurisdiction should establish an independent commission, composed of lay citizens, lawyers and judges, to investigate complaints of judicial misconduct or incompetence against judges in all courts of the jurisdiction. The commission should be empowered to investigate any such complaint received by it, to employ the subpoena power, appoint hearing officers to examine complaints and receive evidence, and to make findings and recommendations to the highest court in the jurisdiction. Such court should be empowered to remove any judge found by

it and the commission to be guilty of gross misconduct or incompetence in the performance of his duties. Provision for censure or suspension should be made for less serious misconduct. In order to protect the participants, provision should be made for keeping all complaints and commission proceedings confidential unless the commission recommends discipline by the highest court, at which time the commission's record, upon being filed with the court, should become public.

**10.** Article 26(c), UCMJ, specifies, in pertinent part:

> A commissioned officer who is certified to be qualified for duty as a military judge of a general court-martial may perform such duties only when he is assigned and directly responsible to the Judge Advocate General, or his designee . . . and may perform duties of a judicial or nonjudicial nature other than those relating to his primary duty as a military judge of a general court-martial when such duties are assigned to him by or with the approval of that Judge Advocate General or his designee.

**11.** *See Wright v. United States*, 2 M.J. 9 (1976).

■ In the absence of congressional action to alleviate recurrence of events such as were alleged to have occurred here,[12] we deem it appropriate to bar official inquiries outside the adversary process which question or seek justification for a judge's decision unless such inquiries are made by an independent judicial commission established in strict accordance with the guidelines contained in section 9.1(a) of the ABA Standards, The Function of the Trial Judge, *supra*. Because the inquiries in this instance all post-dated the judge's sentencing decision, we perceive no error necessitating corrective action insofar as this accused is concerned.

## IV

■ During the Article 32 investigation, the accused unsuccessfully requested the presence of the Government's key witness to cross-examine him and repeatedly objected to the investigating officer's use of the witness' statements. At trial the defense moved to reopen the Article 32 investigation and renewed the request for an opportunity to cross-examine the prosecution witness before the investigating officer. After entertaining argument, the trial judge denied the motion without comment.

The record indicates that the requested witness, Sergeant West, provided the criminal investigators with the crucial information which led to the defendant's arrest before Sergeant West's transfer from Thailand to Florida. He also provided the only direct evidence at trial with regard to the accused's participation in the charged larcenies. Additionally, at one point during the investigation, it was necessary to recess the proceedings in order to secure a third statement from the absent witness concerning the alleged larcenies.

In pertinent part, Article 32(b), UCMJ, provides:

At that investigation full opportunity shall be given to the accused to cross-examine witnesses against him if they are available.

In addition, the Article 32 investigating officer is charged with, among other duties, making an inquiry "[in] to the truth of the matter set forth in the charges." Article 32(a), UCMJ. In *United States v. Samuels*, 10 U.S.C.M.A. 206, 212, 27 C.M.R. 280, 286 (1959), we recognized these essential features in holding that the investigation "serves a twofold purpose. It operates as a discovery proceeding for the accused and stands as a bulwark against baseless charges."

This is the first occasion, however, in which this Court squarely has faced the difficult question of determining the meaning of the word "available" as it is used in Article 32(b) to specify the witnesses whom the accused is entitled to cross-examine during the pretrial investigation.[13] In *United States v. Davis*, 19 U.S.C.M.A. 217, 41 C.M.R. 217 (1970), we rejected the notion that a serviceman's availability to testify at trial could be measured solely in terms of miles from the situs of trial. *Compare* Article 49(d)(1), UCMJ, *with United States v. Gaines*, 20 U.S.C.M.A. 557, 43 C.M.R. 397 (1971).[14] That rationale, it appears to us, is equally appropriate here even though the statutory standard of confrontation for Article 32 investigations differs from the constitutional standard applicable to criminal trials. *See United States v. Samuels, supra.*

---

12. The appearance of judicial tampering could be eliminated by congressional action to provide some form of tenure for *all* judges in the military justice system.

13. *United States v. Samuels*, 10 U.S.C.M.A. 206, 27 C.M.R. 280 (1959), dealt solely with the types of statements an Article 32 officer may consider once the unavailability of a given witness already has been established. The U. S. Air Force Court of Military Review on three occasions has addressed the question now be-

fore us. *United States v. Lemons*, 49 C.M.R. 521 (A.F.C.M.R.1974), *reversed on other grounds*, 23 U.S.C.M.A. 412, 50 C.M.R. 294, 1 M.J. 34 (1975); *United States v. Chavez-Rey*, 49 C.M.R. 517 (A.F.C.M.R.1974), *reversed on other grounds*, 23 U.S.C.M.A. 412, 50 C.M.R. 294, 1 M.J. 34 (1975); *United States v. Cox*, 48 C.M.R. 723 (A.F.C.M.R.1974), *petition denied*, 23 U.S.C.M.A. 616 (1974).

14. The provision in issue was the so-called "100 mile rule."

Congress has not seen fit to tie the Uniform Code's deposition statute and its "100 mile rule" to Article 32 investigations but instead has limited Article 49's scope to "any military court or commission . . . or any proceeding before a court of inquiry or military board." *Compare* Article 49(d), UCMJ, *with Hearings on H.R.2498, Before a Subcomm. of the House Comm. on Armed Services*, 81st Cong., 1st Sess. 996–97 (1949). In the absence of congressional definition, we believe the concept of availability embodied in Article 32 requires a balancing of two competing interests. The significance of the witness' testimony must be weighed against the relative difficulty and expense of obtaining the witness' presence at the investigation. As already noted, Sergeant West was the key prosecution witness in this case, and hence his testimony and the accused's statutory right of cross-examination were crucial in order to afford both the investigating officer and the convening authority sufficient information to fulfill their statutory responsibilities. Although the transportation expenses to return Sergeant West to Thailand from Florida would have been substantial, we believe the significance of this factor in the availability equation [15] is somewhat diluted by virtue of Sergeant West's untimely transfer from Thailand less than 2 weeks prior to commencement of the Article 32 investigation. In addition, there was no showing that military exigencies or other extraordinary circumstances warranted excusal of the witness, who was subject to military orders. We conclude, therefore, that the trial judge prejudicially erred in failing to grant the appellee's motion to reopen the investigation and to order the live appearance of the Government witness. *See United States v. Cox*, 48 C.M.R. 723, 724 (A.F.C.M.R.1974), *quoting United States v. Mickel*, 9 U.S.C.M.A. 324, 26 C.M.R. 104 (1958).

The decision of the U. S. Air Force Court of Military Review is reversed. The record of trial is returned to the Judge Advocate General. A rehearing may be ordered if the same or a different convening authority deems such a course of action appropriate after completion of a new Article 32 investigation and pretrial advice.

Judge PERRY concurs.

## APPENDIX

TO WHOM IT MAY CONCERN

The undersigned served as Military Judge, sitting alone, in the case of *United States v. Ledbetter*. After convicting SSgt Ledbetter of several offenses, he was sentenced to confinement at hard labor, forfeiture of $300 per month for 12 months, and reduction to the grade of Sergeant. At the conclusion of the sentence, I urged the convening authority to insure that the automatic reduction provision of UCMJ, Article 58a, not take effect and that the accused be restored to duty in the grade of Sergeant.

After returning to Clark Air Base, I learned that the 13th AF Staff Judge Advocate and the Commander, 13th Air Force, were not pleased with the sentence. I repeatedly asked the 13th AF SJA to make an appointment for me with the commander so that I might explain my reasoning for the sentence and to again urge the commander to not enforce the provisions of Article 58a. I was never able to discuss the matter with the Commander, 13th AF.

Sometime after the trial and before my hospitalization (24 April 1975), I received several calls from Major Howell and Colonel Connolly, Office of The Judge Advocate General, Washington, D. C., concerning sentences I had imposed in three cases. In each instance I was led to believe that complaints by commanders led to the calls. The Ledbetter case and the alleged leniency of the sentence was one of the cases discussed. I first informed the caller that I considered the calls and the complaints of the commanders to be violations of the

---

**15.** Availability is a question of law ultimately to be resolved, as is true with other such questions, by the trial judge. Neither the witness' inclination to attend nor his commander's desire to order his attendance at a pretrial investigation is conclusively determinative. *But cf. United States v. Farrison*, 10 U.S.C.M.A. 220, 27 C.M.R. 294 (1959).

UCMJ, Article 37. The callers agreed with me but stated they needed my rationale for the sentences in order to be prepared for any discussions of the cases by the Chief of Staff if such discussions materialized, particularly in view of the fact that field commanders had made complaints.

It became apparent to me that in view of the complaint concerning the sentence and the fact that I could not see the 13th AF Commander on the matter, that my recommendations concerning the application of Article 58a would not be approved. I was disturbed by this since it would appear that this particular decision was made before the record of trial was prepared and without permitting me to explain the facts as I saw them presented during the trial.

(s) NORMAN L. PAUL, Colonel, USAF

NORMAN L. PAUL
ATTORNEY AT LAW

TELEPHONE                 7247 BANDERA ROAD
(512) 684-7664            SAN ANTONIO, TEXAS 78228

7 April 1976

Department of the Air Force
Hq USAF/JAJD
Washington, D.C. 20314

Dear Major Houston:

In response to your letter of 23 March 1976, concerning the case of *U. S. v. Ledbetter*, Docket No. 31,438, your questions are answered as follows:

1. Upon your return to Clark AB after the *Ledbetter* trial, from whom, and how did you learn that the SJA and commander were not pleased with the sentence?

A. Upon my return I talked to the SJA, Col Koza. He could not understand why I had not sentenced Ledbetter to a punitive discharge. I informed him that I wished to speak to the commander concerning my sentence and to urge him not to invoke the provisions of Art. 58a. I was informed that the commander was not pleased with the sentence and that Art. 58a would be applied. On many occasions I asked for the SJA to make an appointment for me with the commander but to no avail. I saw the commander once when he visited me in the hospital but I really was in no shape to discuss the case at that time.

2. Did you receive any calls concerning sentences from Washington, before the *Ledbetter* trial? If, so, from whom and what was the nature of the call/or calls?

A. I am not certain as to when the calls were made, however, I believe most of them were made after the *Ledbetter* trial and some were after all three trials had been completed. The three trials, in the order tried, were Lucero, Ledbetter, and Mungin. I believe that I received a call from Major Howell, Hq USAF, after the *Ledbetter* case concerning both the Ledbetter and Lucero sentences. He wanted to know why I had imposed these particular sentences. He indicated that there had been some complaints from the field in both cases and wanted to know my reasoning so it could be explained to the Chief of Staff if an inquiry was made. I informed him that I believed any questions to me were a violation of Art. 37, UCMJ.

3. What calls did you receive from Washington after the *Ledbetter* case? When, from whom, of what nature?

A. To the best of my knowledge I received telephone calls from Major Howell, Col. Connolly, and Gen. Vague. All of these calls were after all three cases had been completed. In several of the conversations the caller stated he wanted info on three cases. During each call I was asked to explain my reasoning as to why I decided on the particular sentence imposed. In every case I informed the caller that I thought any inquiries of this sort amounted to a violation of Art. 37, UCMJ, however, in each case, I was informed that the call was just to determine information in case the Chief of Staff or any other senior officer had questions concerning the case.

4. What led you to believe that these calls were the result of complaints by commanders?

A. I was informed by both Major Howell and Col. Connolly that the 13th AF commander had registered complaints concerning the Lucero and Ledbetter cases. The

complaints had evidently been made to the 13th AF SJA to PACAF SJA and then to Washington. Also I was informed by Major Howell and Col. Connolly that the 5th AF commander had personally complained to Washington about the Mungin case.

5. Did you get the impression that any of your superiors in The Judge Advocate General's Department were criticizing your sentences?

A. Most definitely. Gen. Vague even asked me why I didn't at least sentence Mungin to a $50 forfeiture just for appearances sake. Also I believe my assignment to a non-military judge slot was directly attributable to my so-called lenient sentences in those three cases. I had been led to believe by Col. Connolly ever since I became a MJ that I would be taking his place. My replacement was stationed at Bolling AFB prior to his assignment to the Philippines. At first I was to trade jobs with him and then move over to the Forrestal Building when Col. Connolly retired. I was informed, however, that a colonel would not be sent to Bolling and instead I was to go to USAFSS since there were no colonel vacancies in the judiciary. At the same time the SJA at Guam was transferred to San Antonio and became the senior judge of that circuit. Since that time and prior to my medical retirement comments have been made to the effect that my assignment to USAFSS was because of my poor health since the USAFSS office was not very active. I received my assignment before I or anyone else knew I was sick.

6. Are there any other facts bearing on these matters that you believe are relevant for consideration by the Court of Military Appeals?

A. Yes, sentences imposed by other military judges under my supervision were also subject to criticism by commanders. Particularly, I received a letter from the commander at Okinawa criticizing the sentence imposed by Capt. Sweeney. The letter disclaimed a violation of Art. 37, but then proceeded to inform me (Capt. Sweeney's ER officer), of the deficiencies in the sentence. I considered this a violation of the

Code and forwarded it to Hq. USAF, Col. Connolly for disposition. Copies of that letter and his answer should be on file at Hq. USAF.

Sincerely yours,

(s) Norman L. Paul
Colonel, USAF(Ret)

## AFFIDAVIT

I am Major General Harold R. Vague, The Judge Advocate General, United States Air Force.

## STATEMENT

In April 1975, I had a telephone conversation with Colonel Norman Paul while he was Chief Judge of the 7th Circuit, Clark Air Base. I had been informed that he had personally signed court-martial charges against a squadron commander for misuse of Government vehicles. In our conversation I told him that although he had a legal right to do so, as a matter of policy I did not think it wise—since he would obviously disqualify himself from sitting on the case as a judge, and would probably disqualify any other judge in his circuit from sitting. I suggested that it would be better practice to follow normal military procedure and send a report of alleged wrongdoing to the offender's commander. He agreed and, I later learned withdrew the charges.

At the beginning of this conversation, I told him that I was aware that some concern had been expressed about the judiciary in the Pacific, primarily for allegedly causing time delays, and for sentences that some people considered inappropriate. I told him that I had thoroughly checked into the time delay problem and that as far as I was concerned the judiciary was definitely not at fault. I also told him that over the years I had engaged in numerous discussions of "appropriate" sentences and in my view appropriateness was a subjective matter best left to those who hear the evidence. I told him I had heard some comment about the case in Japan in which he had found a master sergeant guilty and sentenced him to "no sentence whatsoever." I said that

such a sentence was admittedly somewhat unusual and that most judges would probably have sentenced him to at least a reprimand (contrary to Colonel Paul's assertion, I do not recall mentioning the words "forfeiture of $50" or even the word "forfeiture" in this conversation).

Some time prior to this conversation I had received a telephone call from Brigadier General Frank House, Staff Judge Advocate of Pacific Air Forces. He advised me of the "no sentence whatsoever" sentence, and told me that the Commander of Fifth Air Force in Japan might well bring this to the attention of the Chief of Staff. I, therefore, asked Colonel Connolly, Chief of the Trial Judiciary in my office, to try to determine what facts had lead to the unusual sentence so that I could respond intelligently if queried by the Chief of Staff.

I was never queried by the Chief of Staff on the case, and to my knowledge the Commander of Fifth Air Force never raised the matter through command channels.

Colonel Paul mentions two other cases that he says were a matter of criticism: the Ledbetter and Lucero cases. I have no recollection whatsoever of either of these cases being brought to my attention while Colonel Paul was at Clark Air Base.

My recollection of events concerning Colonel Paul's reassignment from Clark Air Base is as follows: In early 1975, he sought a resolution of the question of his reassignment. I authorized, and action was taken, to forecast him to a judiciary position at Bolling AFB. In his letter of notification, he was cautioned that unexpected retirements might cause a change in the forecast.

A colonel Vic Orsi, SJA at USAF Security Service, San Antonio, Texas, who was scheduled for retirement in January 1976, later announced that he was retiring early—in August 1975.

In looking over qualified colonels to replace Colonel Orsi, I noted that Colonel Paul had several years as a line officer in Security Service, and obviously knew the workings of the command. I decided that he was the best qualified colonel available for this position. After discussing his qualifications with Major General H. P. Smith, Commander of USAF Security Service, who approved his assignment, I authorized a change of Colonel Paul's assignment from Bolling AFB to USAF Security Service. All of this occurred before I was aware that Colonel Paul had serious medical problems.

/s/ Harold R. Vague
The Judge Advocate General
United States Air Force

Subscribed and sworn to before me this 16th day of April 1976.

/s/ Julius C. Ullerich, Jr.
Colonel, USAF
Appellate Government Counsel

TO WHOM IT MAY CONCERN:

I am THOMAS J. CONNOLLY, Colonel, USAF (Retired), P. O. Box 763, Venice, Florida, 33595.

I have read a TO WHOM IT MAY CONCERN statement signed by Norman L. Paul, Colonel, USAF (Retired), in which he alleges improper concern was expressed over his sentences in the *Ledbetter* case and two other cases. During the period in question in his statement I was Chief, Trial Judiciary Division, Office of The Judge Advocate General, USAF.

I am amazed by the implications contained in the statement. I never criticized Colonel Paul for any sentence he adjudged in any particular case. Neither did any of my superiors criticize Colonel Paul either to me or through me for any sentence he adjudged.

To put this matter into perspective, I was concerned from a manning point of view as to whether we had sufficient trial personnel, i. e., judges, trial and defense counsel, to process cases in the Pacific area expeditiously and whether they were located in the most effective places to reduce TDY time and costs. I was concerned at what appeared to be long delays between charges and dates of trial. To this end I looked to Colonel Paul, as the senior trial judge in the Pacific, to provide me with complete information on all cases, pending or tried, from a

period beginning about 1 October 1974 to about February or March 1975, whenever it was I contacted him. I thought I made it clear that I did not want any delays to be attributed to the trial judiciary. Also, at a time when U.S. Forces were being reduced, I did not want an excessive number of judiciary personnel sitting around the Pacific with little to do. I wanted sufficient information to analyze any problem areas and recommend any administrative changes that would reduce delays in trials. I also looked to Colonel Paul, as the senior trial judge, to discuss the law and judicial philosophies with his younger judges and encouraged cross-service discussions with his Army and Navy counterparts in the Pacific.

What transpired between Colonel Paul and the 13th Air Force staff judge advocate I do not know. Suffice it to say the 13th Air Force staff judge advocate never complained to me about the sentence in any of Colonel Paul's cases.

The period in early 1975 was perhaps a difficult one for Colonel Paul because of the uncertainties regarding the state of his health. However, to my knowledge, no one in the Air Force Judiciary attempted to influence him in any way in his legal rulings as a judge or in the sentences which he adjudged.

/s/ THOMAS J. CONNOLLY
Colonel, USAF (Retired)

Date: 12 April 1976

AFFIDAVIT

I, JOHN E. HOWELL, Major, USAF, 375–36–8883, assigned to the Trial Judiciary Division, Office of The Judge Advocate General, Washington, D. C. 20314, make the following statement freely and voluntarily.

I have reviewed the Trial Judiciary files relating to the case of *U. S. v. Ledbetter* and Colonel Paul's undated "To Whom It May Concern Letter". I have also discussed the substance of a telephone call between Colonel Ullerich and Colonel Paul with Colonel Ullerich.

I was assigned to the Trial Judiciary Division as a Special Court-Martial Military Judge and assistant to the Chief of the Trial Judiciary Division, Colonel Thomas J. Connolly, in December 1973. Colonel Connolly, as the Chief of the Division, functioned as the Chief Trial Judge of the Air Force. He was the Officer Effectiveness Report (OER) rating official for those officers assigned as General Court-Martial Trial Judiciary Officers (Military Judges designated under Article 26(c), UCMJ) and the OER indorsing official for the other officers assigned as Special Court-Martial judges in the USAF Trial Judiciary. As his assistant, my duties included writing reports, preparing correspondence and other administrative duties. I also sat as military judge on Special Courts-Martial throughout the First Judiciary Circuit, of the USAF Trial Judiciary.

During the last several months of 1974 and the spring of 1975, Colonel Connolly was quite concerned that we did not have a sufficient manning in the Pacific to provide military judges for all the courts-martial arising in the Seventh Circuit. Colonel Norman L. Paul was the Chief Trial Judge for the Seventh Circuit which included the entire Pacific area. I recall that we received two specific comments that the trial of cases had been delayed because there was no military judge available. Colonel Kosa, then Staff Judge Advocate of 13th Air Force headquartered at Clark Air Base, Philippines, alleged that two cases, *U. S. v. Avery* and *U. S. v. Lucero*, were each delayed approximately one month because no military judge was available. On another occasion, it was reported that two special courts-martial in Korea had become the subject of command interest because of delays incurred in the pre and post-trial processing. On each occasion, I called the Seventh Circuit Office at Clark to obtain details on the cases mentioned in order to determine if any action was required by our division. We also did a survey of processing times on all courts-martial in that circuit over a fixed period to determine if short term or long term manning assistance was required. Short term manning problems could be relieved by sending a judge

from one of the other Trial Judiciary Circuits into the Pacific to help try outstanding cases. This had been done on several occasions. Long term manning could be relieved only by the permanent assignment of another judge to the circuit.

Occasionally, it was necessary to discuss other matters with that circuit. On one occasion, I remember talking to Colonel Paul about the special court-martial of *U. S. v. Mungin*, which was tried at Yokota, Japan, on 25 March 1975. Master Sergeant Arthur L. Mungin was charged with breaking and entering in violation of Article 130 and conducting wrongful eavesdropping in violation of Article 134. I understand one specification was dismissed but Sergeant Mungin was convicted of some misconduct and sentenced to "no punishment". Colonel Paul sat as military judge on this case. I cannot recall exactly who brought the matter to my attention; but I can remember that there was some concern from the facts of the case that Sergeant Mungin was involved with Russian intelligence since the subject of his eavesdrop had been a neighboring Sergeant whose duties involved Top Secret Cryptographic matters. Since we knew that the case was a Special Court-Martial and that the sentence did not include a punitive discharge, we knew that the record of trial would not be routinely forwarded to this headquarters for review. (Only those special courts-martial in which a punitive discharge is adjudged are reviewed at this headquarters. All other special courts-martial are reviewed by the general court-martial authority and retained at that location.) Consequently, I was directed to call Colonel Paul and obtain as much information about the case as possible so that we in the Judiciary could be prepared to discuss the case, should that become necessary. I remember calling Colonel Paul from my home in Alexandria because there is a 12 hour time difference between Washington and the Philippines. I told Colonel Paul that I was calling about the Mungin case, that it had created some sort of a stir and could he please give me the facts of the case, details about the trial and the sen-

tence. I remember that Colonel Paul became rather agitated and asked me if I didn't think that such an inquiry to us and, through us to him, violated Article 37. As I remember it, I said something to the effect that it may or it may not, it wasn't my concern, but I needed the information for Colonel Connolly. I think that I mentioned that there was some command interest in the matter because of the possible security problems. After voicing his complaints about my call, he told me that Sergeant Mungin had testified that he was trying to obtain evidence that his neighbor had poisoned his pet. He had access to some bugging equipment, so he crawled across the common attic which he shared with the neighbor and planted a microphone in the neighbor's house. He did not discover anything about the pet, but began to hear bedroom sounds. He became fascinated with the sounds and became a voyeur. He testified that he did not overhear any classified information and was not concerned with spying. At the trial, Colonel Paul said that the defense presented the most impressive display of mitigating evidence he had ever seen. There were a number of letters of commendation, a letter from J. Edgar Hoover concerning Sergeant Mungin's previous work in breaking up a Russian spy ring, testimony from several Colonels, evidence of the award of the Legion of Merit, and other evidence of a truly outstanding military career. Colonel Paul said that he felt any punishment other than "no punishment" would have been totally inappropriate. I thanked him for the information and relayed it to Colonel Connolly.

I believe that Colonel Connolly had several conversations with the Seventh Circuit office during this time, but I do not know who he spoke with or the subject of those conversations.

I spoke to Colonel Paul's office on several occasions and on at least one occasion, I asked about the sentence adjudged in a specific case (*Mungin*). I do not specifically remember discussing the *Ledbetter* case or any other case or sentence with him. My calls were for the purpose of gathering information and not to criticize or attempt

to influence Colonel Paul's behavior. It would be presumptuous of me to attempt to tell a senior military judge how to try his cases.

To my knowledge, Colonel Connolly never told anyone how to try their cases. On many occasions, judges would call Colonel Connolly and ask his advice on specific problems. On those calls where I was involved in taking down information or relaying messages, Colonel Connolly made it a practice to sound out the judge on his own thoughts and offer some observations of his own. He did not tell his judges how to decide their cases.

/s/ JOHN E. HOWELL, Major, USAF
Trial Judiciary Division
Office of The Judge Advocate General

Subscribed and sworn to before me this 16th day of April, 1976.

/s/ JULIUS C. ULLERICH, JR.,
Colonel, USAF
Appellate Government Counsel

UNITED STATES V. SSGT FREDERICK V. LEDBETTER $\left.\begin{array}{c}\\ \\ \end{array}\right\}$ AFFIDAVIT
      FR344–34–8523, USCMA
      Docket No. 31, 436

1. Reference to unsworn and undated "To Whom It May Concern" written statement of Colonel Norman L. Paul, USAF.

2. Colonel Paul served as Military Judge, sitting alone, in the general court-martial trial of SSgt Frederick V. Ledbetter. As shown in the record of trial, and the Staff Judge Advocate's legal review, both of which were read by the convening authority, he urged the convening authority to insure that the automatic reduction provision of UCMJ, Article 58a, not take effect and that the accused be restored to duty in the grade of Sergeant. (R373 and SJA Review pages 35–36.) See also Colonel Paul's clemency recommendation dated 7 May 1975 provided to the convening authority with the SJA Review.

3. I do not know of any basis for Colonel Paul's statement that the "13th Air Force Staff Judge Advocate and the Commander, 13th Air Force, were not pleased with the sentence." In fact the Commander of 13th Air Force and myself found the sentence about right although I recommended, and the convening authority approved, reducing the forfeitures from $300 per month to $200 per month and directing Ledbetter's immediate entry into the 3320th Retraining Group. We felt, on the basis of the record and clemency report, that he would successfully complete retraining and be returned to duty in short order, as he was on 8 October 1975 (after having been in the Re-

training Group less than three months), with the unexecuted portion of the sentence suspended 8 October 1975 until 7 February 1976. (I would surmise that the automatic remission came about, although I have no word on that.)

4. The issue as to applicability of Article 58a was discussed in the SJA Review. If my advice in the SJA Review was erroneous, I would assume it would have been pointed out by the Court of Military Review or a grant would have been made by the U. S. Court of Military Appeals on that issue.

5. I can assure the Court that neither the convening authority nor I was predisposed against the military judge's recommendation of clemency. I can also assure the United States Court of Military Appeals, as I thought I did Colonel Paul, that both the convening authority and I would act impartially on Ledbetter's case (as I believe we did). Colonel Paul's feelings and reasons for his sentence were quite evident in the record and in his clemency recommendation. Nevertheless, the convening authority was advised by me of Colonel Paul's request for an appointment so that he might explain his reasoning for the sentence and to again urge the commander not to enforce the provisions of Article 58a. Again, however, Colonel Paul's reasoning for the sentence was in the record (pages 372–3), and his request to not enforce Article 58a was also in the record (ibid), hence both the conven-

ing authority and myself were of the opinion that an appointment for the stated purpose was unnecessary.

6. I do not know what Colonel Paul characterizes as "repeatedly" requesting an appointment. Nor do I understand what he means when he says he was never able to discuss the matter with the convening authority, Commander, 13th Air Force. Colonel Paul had been assigned as base staff judge advocate of Clark AB for two years preceding his assignment as Chief Military Judge of the 7th Circuit. He knew the convening authority personally. He could have called him on the phone or made his own appointment. Not even his hospitalization (starting 24 April 1975) and surgery would have prevented him from directly contacting the convening authority by phone. Captain Ron Rakowsky from my office had personally arranged to have a phone installed in his hospital room and the two of us in fact visited him there. Further, nothing prevented him from submitting a more detailed clemency recommendation than what he had made in the record of trial and by his 7 May 1975 letter to the convening authority if he had been so inclined.

7. The last case tried in 13th Air Force by Colonel Paul was the *Ledbetter* case, on 5–8 March 1975. No attempt was made in any fashion to influence Colonel Paul in the conduct of his military judge's role in the Ledbetter trial. As a matter of fact no attempt was made to influence Colonel Paul in any of the ten cases he presided at within Thirteenth Air Force for the approximate one year he was the circuit judge. Orders promulgating results of his trials within this command are attached and I believe they reflect his complete independence in trials, including reaching findings and sentences, with occasional differences of opinions on the part of convening authorities noted by their actions on his cases. Your attention is directed to these cases (Ledbetter, Lucero, Rivera, Simonelli, Varnado, Murphy, Coleman, White, and Haider). (Note: There are no court-martial orders on the tenth case, *U. S. v. Allen*, since charges were withdrawn in the course of the Article

39a session when a motion was granted for a continuance to have a sanity board and the board's results showed the accused was not mentally responsible.)

8. In a telephone conversation with Colonel Paul on 21 April 1975, he again expressed a desire to speak to the convening authority on the *Ledbetter* case and I told him I thought it might be possible, but he had already made his views known. Colonel Paul repeated that he wanted the interview to emphasize his recommendation that Ledbetter not be reduced and that if my recommendation to the convening authority was going to be the same then there would be no need for the personal session between Paul and the convening authority. He stated that he felt the sentence he imposed was the proper sentence but if the trial had been after 1 May 1975 the convening authority would not have had a choice but to abide by his (the judge's) decision as to the appropriate sentence. In effect, he asked me to either grant him an audience with the convening authority or to commit myself to him (Paul) that I would recommend Ledbetter's retention in grade and somehow assure the convening authority did not allow the automatic reduction provision of Article 58a to take effect. I would not commit myself. Furthermore, I did not know and I am convinced Colonel Paul did not know how his clemency desires could be accommodated short of getting a Secretary of the Air Force waiver-something the convening authority did not possess-or suspending or disapproving the confinement.

9. There was never any complaint by the 13th AF Commander (general court-martial convening authority) or myself concerning Colonel Paul's sentences, in *Ledbetter* or any other case. I do not know whether there was from any other source.

10. The convening authority and I reviewed the *Ledbetter* case with open minds. The decision in the *Ledbetter* case was not made until 10 July 1975. I studied that record cover to cover as did the convening authority. If the case had been tried after 1 May 1975 there would have been more

latitude in action on the sentence, the reduction portion thereof. But the case was tried 5–8 March 1975 before the change affecting Article 58a.

(s) M. E. KOSA, Colonel, USAF
Staff Judge Advocate

9 Atch
1. Ledbetter—GCMO No. 3, 10 Jul 75
2. Lucero—GCMO No. 2, 15 May 75
3. White—SCMO No. 5, 3 Mar 75
4. Coleman—SCMO No. 4, 18 Feb 75
5. Rivera—GCMO No. 1, 18 Mar 75
6. Varnado—SCMO No. 1, 14 Feb 75
7. Murphy—SCMO No. 1, 20 Jan 75
8. Haider—SCMO No. 33, 6 Dec 74
9. Simonelli—SCMO No. 1, 20 Jan 75

Subscribed and sworn to before me this 2nd day of April 1976.

(s) WILLIAM R. HITT, Major, USAF
Judge Advocate

COOK, Judge (concurring in part and dissenting in part):

As to the timeliness of the convening authority's post-trial review, discussed in point I of the principal opinion, I agree that the Court of Military Review correctly determined "the *Dunlap* rule simply does not apply"[1] because the accused was released from post-conviction restraint. I do not concur in the implication in footnote 5 that convening authorities in the field have tended to apply *Dunlap* in a way that is so alien to the spirit of the case that a more rigid rule may be required. Every flexible standard, whether it be probable cause for the issuance of a warrant, determination of the effectiveness of defense counsel, or, as here, assessment of the promptitude of prosecution, generates some cases that can be resolved only on appeal. I am not, therefore, distressed by what I have seen of the application of *Dunlap*.

I concur with the disposition of the certified question discussed in point II for the reasons stated by the Court of Military Review. That court did not reach the question whether a convening authority can, on his own initiative, reconsider a denial of an application for deferment, if such reconsideration occurs within a reasonable time after the original action; it held only that he could not do so "at a much later time."[2] The majority commend the reasoning of the Court of Military Review as "sound," but later say that "once a deferment request is considered and denied, the accused must again request a deferment before a release from confinement qualifies as such and thereby tolls the running of the confinement portion of the adjudged sentence." If that statement is intended to prohibit reconsideration of denial even an hour or a day after its promulgation, I believe it improperly restricts the convening authority.

Although our own rules do not so provide, this Court has on numerous occasions recalled a previous ruling on its own motion. *See, e. g., United States v. Sanchez,* 23 U.S.C.M.A. 650 (1975); *United States v. Aharonian,* 23 U.S.C.M.A. 649 (1975). The rules of the Courts of Military Review expressly allow reconsideration of a decision by that court, on its own motion not just on application of a party. Rule 19, Rules of Practice and Procedure, Courts of Military Review, 40 C.M.R. at XXXVIII. A similar rule obtains in a number of the Federal civilian courts. Rule 12, U.S. Court of Appeals (5th Cir.); Rule 3(b), U.S. Court of Appeals (6th Cir.); Rule 68(d), U.S. Court of Claims. Commenting generally on the right of a judicial and quasi-judicial authority to reconsider on its own motion, this Court held that there is "inherent" power to do so, and that the power can be exercised, unless prohibited by statute or the tribunal has lost jurisdiction over the subject matter. *United States v. Reeves,* 1 U.S.C.M.A. 388, 390, 3 C.M.R. 122, 124 (1952). The matter in issue is so connected with, and dependent upon, the court-martial proceedings that I believe the same rule applies to it. In my opinion, therefore, reconsideration by the convening authority, on its own motion and within a reasonable time of his original

---

1. *United States v. Ledbetter,* 1 M.J. 746, 748 (1975).

2. *Id.*

decision, is not contrary to the language, or intention, of Article 57(d), Uniform Code of Military Justice, 10 U.S.C. § 857(d), or any supplementary provision in the Manual for Courts-Martial. *See* Manual for Courts-Martial, United States, 1969 (Rev.), paragraphs 88*f* and *g*.[3]

In regard to point III, I have no disagreement with the majority's generalization that the Judge Advocate General of an armed force should not be a "conduit for command influence," but I disagree emphatically with the implication that what the Judge Advocate General did here requires measures to prevent its "recurrence." In my judgment the Judge Advocate General's actions were consistent with his statutory responsibilities and do not call for the censure implied by the majority. *See* Articles 6, 26, 67(g), and 74, UCMJ, 10 U.S.C. §§ 806, 826, 867(g), and 874, respectively.

Turning to the majority's action on the trial judge's ruling on the defense motion to reopen the Article 32 investigation, which is covered in point IV of the principal opinion, I believe their decision is wrong because it does not take account of significant legal differences between the unavailability of a witness for a trial and his unavailability for a preliminary hearing. At trial, subject to certain limited conditions of necessity, an accused has a constitutional right to confront the witnesses against him. The fact that a witness is at a place distant from the situs of trial is, therefore, not itself sufficient reason to deny the accused the right to confront and cross-examine the witness in person. *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968); *United States v. Gaines*, 20 U.S.C.M.A. 557, 43 C.M.R. 397 (1971); *United States v. Davis*, 19 U.S.C.M.A. 217, 41 C.M.R. 217 (1970). However, there is no constitutional right to confront a witness during the investigative stage of the criminal proceedings, so determination of the witness' availability for personal testimony at an investigative hearing may properly depend upon circumstances that would not apply in regard to appearance at trial. The Air Force Court of Military Review has recognized and consistently applied this difference in regard to the availability of a witness for the purpose of an Article 32 investigation. In three cases, it has held that absence of a witness from the place of an investigative hearing under Article 32 justified a finding of unavailability; in one of these cases, the nature of the absence virtually duplicates that present in this case. The cases are: *United States v. Cox*, 48 C.M.R. 723 (A.F.C.M.R. 1974), *petition denied*, 23 U.S.C.M.A. 616 (1974); *United States v. Chavez-Rey*, 49 C.M.R. 517 (A.F.C.M.R.1974), and *United States v. Lemons*, 49 C.M.R. 521 (A.F.C.M. R.1974), companion cases reversed by this Court on another ground, 23 U.S.C.M.A. 412, 50 C.M.R. 294, 1 M.J. 34 (1975).

In *Cox*, the issue of witness' availability at an Article 32 hearing was the only one raised by the accused in his petition for grant of review filed in this Court; in the other cases the question was presented in one of a number of assignments of error, but this Court granted review only upon another point, upon the basis of which the cases were reversed. A majority of the court has remarked that "denial of a petition is of *no precedential value* and should not be cited . . . or relied upon as authority." *United States v. Mahan*, 1 M.J. 303, 307 (1976). I take a different view of the matter, but my reasons are not relevant to the point of my disagreement with the majority here. Suffice it to say that, as the accused is a member of the Air Force, all the cited cases are of precedential value, and the principles of law and the facts upon which they were decided must be examined

**3.** I recognize, as *United States v. Reeves*, 1 U.S.C.M.A. 388, 3 C.M.R. 122 (1952), points out, that events subsequent to the original decision may legally prevent reconsideration, even though a reasonable time has not yet elapsed. For example, in the interim between the initial denial of the application for deferment and reconsideration, the accused may have left the jurisdiction of the convening authority. Arguably, the authority to reconsider in that instance may be lost by virtue of the provisions of paragraph 88*f*, Manual for Courts-Martial, 1969 (Rev.). The filing of a petition for review of the denial with an appellate court, as in *Collier v. United States*, 19 U.S.C.M.A. 511, 42 C.M.R. 113 (1970), may have the same effect.

54

by this Court in determining the legality of their affirmance of the trial ruling. For myself, I am satisfied that the cases are correct in their determination that, while the absence of a witness from the place of trial is not alone justification for denying an accused the constitutional right to confront the witness at trial, the legitimate absence of a witness from the situs of a hearing by an Article 32 investigating officer is, itself, sufficient reason to find that the witness is unavailable to testify in person, within the meaning of Article 32.

*Cox* and this case are almost identical in their operative facts. There, the Article 32 hearing was held in Puerto Rico, the situs of the offenses. The investigating officer did not call a major Government witness "because he was then on leave in the United States." *United States v. Cox, supra* at 724. Here, the place of the Article 32 hearing was Udorn, Thailand, which was also the place of the commission of the alleged offenses; the witness was on regular duty at Homestead Air Force Base, Florida. As the majority refer to *Cox* with apparent approval, and there is not a scintilla of evidence that the witness was transferred from Thailand to the United States "to prevent . . . [his] appearance at the Article 32 investigation,"[4] in my opinion, *Cox* and the other mentioned cases impel the conclusion that the decisions of both the Article 32 investigating officer and the trial judge as to the availability of the witness were correct. That conclusion is, I believe, also supported by the legislative consideration of Article 32.

During the hearings on the Uniform Code, Congressman Norblad, a member of the Subcommittee of the House Armed Services Committee considering the draft bill, commented on the absence of a witness as affecting availability, as follows:

I think the one important factor to keep in mind on this is that this is not the trial. It is merely the preliminary investigation

to satisfy the officer investigating that there is probable cause that the man did commit the crime and there is enough evidence to warrant that he should be put on trial.

They are not trying to decide whether he is guilty or innocent. So I don't think it is so important here as it is in the trial of the case to have the witnesses available.

*Hearings on H.R. 2498 Before a Subcomm. of the House Comm. on Armed Services,* 81st Cong., 1st Sess. 997 (1949).

Mr. Felix Larkin, one of the principal representatives of the Department of Defense for presentation of the draft bill to the subcommittee, seemed at one point in his presentation to confuse the difference between producing a witness for a preliminary hearing and producing him at trial. Eventually, however, he acknowledged that the fact a witness was present in a foreign country made him "unavailable" for an investigation conducted in the United States. *Hearings on H.R. 2498, supra* at 998. Further, in response to a question by Congressman Anderson as to how "far away" a witness has to be to be unavailable within the meaning of Article 32, Mr. Smart, counsel to the subcommittee, suggested an analogy to the deposition procedure provided by Article 49(d)(1) of the Code and indicated that "100 miles may be construed as a reasonable distance" that would alone render the witness unavailable for the hearing. *Hearings on H.R. 2498, supra* at 996.

The report of the full Committee on Armed Services to the House indicates that the committee did "not intend to endorse any provisions which will bring added delays and unnecessary technicalities" into the system of military justice. Considering that, as to an incarcerated accused, the Government has only 90 days to complete all essential pretrial proceedings and bring him to trial or incur a heavy burden of rebutting a presumption of prejudicial delay,[5] I believe that to apply for an Article 32 investigation

4.  *United States v. Chavez-Rey,* 49 C.M.R. 517, 519 (A.F.C.M.R.1974).

5.  *United States v. Driver,* 23 U.S.C.M.A. 243, 49 C.M.R. 376 (1974).

the same criterion of availability for a witness at a preliminary investigation as is required by the Constitution for a witness at trial would defeat the declared intention of Congress. Although the discussions of the matter during the hearings were incomplete, in my opinion, they demonstrate that Congress considered the presence of a witness at a place distant from that of the Article 32 hearing made him unavailable for that hearing. In my opinion, the majority's decision is contrary to that understanding and incorporates into the preliminary procedure conditions of delay and "unnecessary technicalities" that Congress sought to avoid. Considered with the 90-day speedy trial requirement, the majority's ruling needlessly imperils future prosecutions. It is not required by the legislative discussion on, or the text of, Article 32, and I cannot agree with it.

My conclusion as to the correctness of the ruling below requires some further comment on an aspect of the issue not mentioned in the several opinions of the Air Force Court of Military Review. In the civilian community, a grand jury, whose investigative function is like that of the Article 32 investigating officer in that it determines whether a crime has probably been committed and whether the accused probably committed it, can consider, and return an indictment on, hearsay evidence alone. *United States v. Dionisio*, 410 U.S. 1, 93 S.Ct. 764, 35 L.Ed.2d 67 (1973). Military law accords an accused a greater right in an Article 32 investigation in that he is entitled to cross-examine the witnesses against him "if they are available." Article 32(b), UCMJ. The Code does not indicate who has authority to determine the availability of a witness, but the Manual provides that "[o]rdinarily, application for the attendance of any witness subject to military law will be made to the immediate commanding officer of the witness". MCM, paragraph 34*d*. I do not construe the Manual provision as prohibiting the Article 32 investigating officer from determining availability, especially when the commanding officer of the witness is also at a distant place. True, a military witness is always subject to orders and can readily be transferred from one place to another, but the availability of process to authorize transfer is not tantamount to availability for transfer within the meaning of Article 32.

One further matter remains for consideration. Conceding the witness' unavailability at the Article 32 hearing does not necessarily mean that the accused could not question him before trial. There are at least two courses available to him to obtain such examination: he can proceed formally, as provided by Article 49, to take the deposition of the witness; or, he can, as the accused did here, examine the witness informally when he comes to the place of trial. If defense counsel is unable to pursue either course, and, therefore, believes himself unprepared to cross-examine the witness at trial, he can properly apply to the trial judge for a continuance for that purpose. Commendably, the trial judge in this case recognized the potential problem and before ruling on the defense motion specifically inquired of defense counsel whether he had examined the witness. Defense counsel replied in the affirmative, and made no request for a continuance for further preparation for trial.

On the record, I discern no possibility of prejudice to the accused as a result of the unavailability of Sergeant West for the Article 32 investigation. I would, therefore, affirm the decision of the United States Air Force Court of Military Review.

**UNITED STATES, Appellee,**