## UNITED STATES

v.

**Michael N. FREDERICK, 228 76 8433, Private First Class (E–2), U. S. Marine Corps.**

**NCM 74 2576.**

U. S. Navy Court of Military Review.

Sentence Adjudged 16 Jan. 1978.

Decided 25 May 1979.

LT Christopher C. Henderson, JAGC, USNR, Appellate Defense Counsel.

LT J. G. VanWinkle, JAGC, USNR, Appellate Government Counsel.

Before BAUM, MICHEL and GRANGER, JJ.

MICHEL, Judge:

In the early morning hours of 25 February 1974, the life of Mrs. S. L. C., the dependent wife of a Marine Corps corporal, was tragically and violently snuffed out. Appellant was tried by general court-martial composed of officer members on an

allegation of premeditated murder[1] for his criminal complicity in her demise. Contrary to his pleas, he was found guilty in the lesser degree of unpremeditated murder[2] and duly sentenced on 24 May 1974 to confinement at hard labor for 75 years, total forfeiture of pay and allowances, reduction to pay grade E–1, and a dishonorable discharge. This Court, on 19 February 1976, affirmed that conviction and its attendant sentence.[3] Subsequently, on 25 July 1977, the U.S. Court of Military Appeals reversed appellant's conviction, utilizing that case as a vehicle to alter the standard of insanity then recognized by the military criminal justice system so as to bring it into conformity with that standard espoused by the American Law Institute (ALI).[4] Thereafter, appellant was tried anew on a allegation of unpremeditated murder. Appellant again pleaded not guilty, but another panel of general court-martial officer members found him guilty of the lesser included offense of voluntary manslaughter[5] and sentenced him, on 16 January 1978, to the maximum punishment imposable for this offense: confinement at hard labor for 10 years, total forfeiture of pay and allowances, reduction to pay grade E–1, and a dishonorable discharge.[6] The findings and sentence, undisturbed by reviewing authorities below, are now properly before us for scrutiny.[7] Appellate defense counsel has assigned six errors as follows:

## I

APPELLANT WAS SUBSTANTIALLY PREJUDICED BY THE FAILURE TO CONVENE A BOARD TO INQUIRE INTO APPELLANT'S SANITY PURSUANT TO PARAGRAPH 121, MCM, 1969 (Rev.).

## II

THE MILITARY JUDGE ERRED BY REFUSING TO ORDER AN INVESTIGATION INTO THE CHARGES WHICH COMPLIED WITH THE MANDATES OF ARTICLE 32, UCMJ, AND PARAGRAPH 34, MCM, 1969 (Rev.).

## III

INASMUCH AS THE ARTICLE 34 ADVICE LETTER WAS DRAFTED BY TRIAL COUNSEL, THE MILITARY JUDGE ERRED BY REFUSING TO ORDER A NEW PRETRIAL ADVICE LETTER COMPOSED BY AN INDEPENDENT AND NEUTRAL PERSON.

## IV

THE MILITARY JUDGE ABUSED HIS DISCRETION BY FAILING TO GRANT A CONTINUANCE SO THAT THE DEFENSE COULD OBTAIN A MEDICAL EXAMINATION CONCERNING THE APPELLANT'S MENTAL DEFECT.

## V

APPELLANT WAS SUBSTANTIALLY PREJUDICED BY THE MILITARY JUDGE'S UTILIZATION OF MATTER NOT INTRODUCED INTO EVIDENCE AS WELL AS THE WRONG LEGAL STANDARD ON HIS ADJUDICATION OF THE MOTION TO SUPPRESS APPELLANT'S PRETRIAL ADMISSIONS.

## VI

APPELLANT WAS SUBSTANTIALLY PREJUDICED BY THE FAILURE OF THE MILITARY JUDGE TO GRANT THE DEFENSE EQUAL ACCESS TO

1. Article 118(1), UCMJ; 10 U.S.C. § 918(1).

2. Article 118(2), UCMJ; 10 U.S.C. § 918(2).

3. *United States v. Frederick*, No. 74 2576 (N.C. M.R. 19 February 1976).

4. Model Penal Code, art. 4, § 4.01 (Proposed Official Draft, 1962). *See United States v. Frederick*, 3 M.J. 230 (C.M.A. 1977).

5. Article 119(a), UCMJ; 10 U.S.C. § 919(a).

6. Para. 127(c), MCM, 1969 (Rev.).

7. Article 66, UCMJ; 10 U.S.C. § 866.

WITNESSES AS MANDATED BY ARTICLE 46, UCMJ.

We address seriatim.

### I

During appellant's first trial, at the instigation of the defense, the military judge caused a military sanity board to be convened to inquire into and evaluate appellant's mental responsibility.[8] Due to a perceived ambiguity in the report of this medical board the military judge directed that another examination of appellant be conducted. This was accomplished and thereafter, during trial on the merits, three psychiatrists testified[9] concerning the central issue in the case—appellant's mental responsibility at the time of the offense. This issue was fully litigated before the trier of fact in the first trial with resultant findings adverse to appellant. Those findings remained unaltered until our judicial superiors chose to set them aside while establishing a new substantive law rule for the military justice system. As a consequence, appellant now invites us to establish a new procedural rule requiring a new sanity board upon a rehearing, which he deems mandated by alteration of the former substantive standard.[10] We decline.

The "preferred status" accorded to the defense of insanity has been well established.[11] Because of this recognition, procedures have been promulgated to insure, in so far as is possible, that every underlying fact bearing upon the mental responsibility of any military accused will be uncovered for submission to the trier of fact on the ultimate issue of guilt or innocence.[12] Concomitantly, these procedures[13] are necessary to minimize the risk of error arising from faulty pretrial investigations and to reduce the referral of ill-founded charges against a military accused.[14] Patently, both facets of consideration have been satisfied in this case. Appellant had the benefit of the favorable testimony of two psychiatrists at his first trial and presented a plethora of supportive evidence through the testimony of a psychiatrist and a clinical psychologist at his second trial.[15] Thus, he cannot be heard now to complain that failure to accord him a procedural safeguard deprived him of the ability to fully litigate a crucial trial issue. Similarly, appellant has never alleged that the original pretrial investigation which preceded the first trial was infirm or defective and we are convinced that such an allegation, if raised now, would come too late. Further, we believe that the absence of yet another

---

8. *See Frederick, supra*, at 3 M.J. 231. No question of appellant's competency to stand trial arose during the course of the former trial, nor is such at issue here.

9. Of these medical experts, the two psychiatrists who examined appellant at the first medical board testified for the defense; their testimony was refuted by the Government's chief witness, the psychiatrist who was a member of the second medical board convened by the trial court's order. *See Frederick, supra*, at 3 M.J. 232.

10. *See United States v. Van Buskirk*, 3 M.J. 341 n.2 (C.M.A.1977). We specifically reject appellant's analogy by inference in that here there is no defense assertion that the second sanity board was invalid or that any Government psychiatrist who examined appellant and rendered findings and opinions based upon those examinations was not competent to do so. All of the defense medical experts who examined appellant did so with a knowledge of the new substantive law standard and that this standard would be utilized at appellant's second trial.

11. *United States v. Babbidge*, 18 U.S.C.M.A. 327, 329, 40 C.M.R. 39, 41 (1969).

12. *See United States v. Walker*, 20 U.S.C.M.A. 241, 246, 43 C.M.R. 81, 86 (1971).

13. *See* para. 121, MCM, 1969 (Rev.), which must be read in light of *United States v. Frederick, supra*, at note 4.

14. *Cf. Lozinski v. Wetherill*, 21 U.S.C.M.A. 52, 53, 44 C.M.R. 106, 107 (1971), *quoting United States v. DeAngelis*, 3 U.S.C.M.A. 298, 305, 12 C.M.R. 54, 61 (1953); *see United States v. Nix*, 15 U.S.C.M.A. 578, 581–582, 36 C.M.R. 76, 79–80 (1965).

15. The opinions of these two expert witnesses were founded upon their own examinations as well as those conducted by a neuropsychologist, a neurologist, a neurosurgeon, and an electroencephalographer. None of these six defense experts were service personnel.

medical board convened for the observation, evaluation, and diagnosis of appellant has not resulted in the referral of an ill-founded charge against him when viewed in the light of the former judgment of conviction. Clearly, appellant here was not entitled to a third board convened under the auspices of paragraph 121, *Manual for Courts-Martial, United States, 1969* (Revised edition). Any other view would plainly be one which "violate[s] judicial common sense."[16] In any event, appellant waived any right he might otherwise have had to a third examination by a board of Government medical experts when he neither filed a request for such an examination with the convening authority or trial court nor made timely objection when it became obvious that a referral to a medical board would not be forthcoming.[17]

II

 In a somewhat similar vein, appellant challenges the military judge's failure to order a new pretrial investigation.[18] He draws substance for this argument from the tridentate argument of trial defense counsel in his unsuccessful motion during the preliminary stages of appellant's second trial. Initially highlighted was the failure of the original investigating officer to address the issue of appellant's mental responsibility. Appellant now alleges that this perceived dereliction operated to his substantial prejudice in that it did not prevent the referral of groundless charges against his client and did not allow proper defense discovery.[19] We do not believe that appel-

lant's conviction, twice for this offense, his recourse to eight expert witnesses,[20] and his access to the entire record of trial in his first court-martial, as well as the report of the original investigating officer, lends credibility to these twin contentions. Further, we do not believe that the failure of the original Article 32 proceedings to be in *verbatim* form hindered the preparation of appellant's case on the merits; in point of fact, there is nowhere found such a requirement in the military justice system,[21] and we find no authority whatsoever to support the creation of one. Finally, we conclude that there is no impediment to the affirmation of appellant's trial findings and sentence attributable to the new standard of mental responsibility, announced and applied for appellant's benefit,[22] not being considered during any preliminary Article 32 investigation. At best, the application of the new legal standard to the operable psychiatric, physiological, neurological, and psychological facts would have presented a conflict of opinion—in short, a justiciable issue correctly within the purview of the trier of fact.[23]

 We would be remiss at this point in not laying to rest certain misconceptions regarding the proper procedural role of the Article 32 investigation in those cases where an original conviction has been overturned by any reviewing entity.[24] While it is true that the pretrial investigation is "not a mere formality," but rather a substantial right afforded a military accused ultimately facing trial by general court-martial, and as

16. *See Babbidge, supra,* 18 U.S.C.M.A. at 332, 40 C.M.R. at 44.

17. *Cf. United States v. Donaldson,* 23 U.S.C.M.A. 293, 294, 49 C.M.R 542, 543 (1975); *United States v. Mickel,* 9 U.S.C.M.A. 324, 327, 26 C.M.R. 104, 107 (1958).

18. Article 32, UCMJ, 10 U.S.C. § 832.

19. *See United States v. Samuels,* 10 U.S.C.M.A. 206, 213, 27 C.M.R. 280, 286 (1959); *accord, United States v. Ledbetter,* 2 M.J. 37, 43 (C.M.A.1976).

20. *See* notes 9 and 15, *supra,* and accompanying text.

21. *See* para. 34e, MCM, 1969 (Rev.); *United States v. Allen,* 5 U.S.C.M.A. 626, 631, 18 C.M.R. 250, 255 (1955).

22. *Frederick, supra,* at note 4.

23. *Cf. United States v. Van Buskirk,* 3 M.J. 341 (C.M.A.1977) where there was merely a unitary psychiatric position as opposed to the conflicting opinions evident here. *See* note 10, *supra.*

24. We choose not to draw a distinction here between the review function performed by a convening authority, *see* paras. 86 and 92, MCM, 1969 (Rev.), and that same function carried out by an appellate tribunal.

such has come to be regarded as "an integral part of the court-martial proceedings,"[25] its inherent procedures should effect a substantial, meaningful benefit to the parties and not be invoked as an empty legalistic ritual. The instant findings of guilt and appellant's present sentence resulted from a rehearing[26] subsequent to appellate action which set aside his original conviction and sentence. A rehearing, with respect to the main issues of guilt adjudication and sentence formulation, is properly viewed as a trial de novo;[27] except for these two issues, all others and the procedures related to them are ancillary and remain uneffected by events subsequent to the original trial.[28] As appellant, by virtue of the rehearing ordered in his case, was merely given the opportunity to litigate anew the issues of guilt and sentence, he was not, as a matter of law, entitled to the advocated benefit of another pretrial investigation. Even if such were not the case, we perceive that another formal investigation, like another sanity board, would have availed appellant nothing of substance with regard to his defense. We also would note that appellant never challenged the factual or legal sufficiency of the pretrial investigation at his original trial or on appeal of his first conviction. That being so, waiver of the issue is deemed patent.[29]

## III

Appellant also complains that inasmuch as the trial counsel allegedly drafted the Article 34 advice letter,[30] the military judge erroneously refused to abate the proceedings in order that someone entirely divorced from those proceedings draft another letter of advice to the convening authority.[31] Resolving the ambiguous evidence relating to the authorship and the letter in question in favor of appellant, we still do not conclude that action by the military judge in this case generated error. While it is true that an accused facing possible trial by general court-martial is entitled, as a matter of right, to have an independent and impartial pretrial advice letter submitted to the convening authority,[32] we nonetheless do not concur in Government counsel's partial concession that, while an Article 34 letter is a necessary prerequisite to every trial by general court-martial, a new Article 34 advice letter was nonetheless not required in this case. It must be kept firmly in mind that the proceedings presently under consideration constituted a rehearing. Such proceedings possess characteristics markedly dissimilar to other trial proceedings in many respects, most of which have been highlighted by statute, order, and case law throughout the military criminal justice system. For example, it is abundantly clear that a general court-martial convening authority must be in possession of a new pretrial advice letter prior to directing further trial by general court-martial where the original proceedings have been terminated by a mistrial, but no such requirement exists where the

25. United States v. Nichols, 8 U.S.C.M.A. 119, 124, 23 C.M.R. 343, 348 (1957).

26. See para. 92a, MCM, 1969 (Rev.).

27. United States v. Flint, 1 M.J. 428, 429 (C.M.A. 1976).

28. Thus, for example, "with the possible exception of the sufficiency of the evidence to support the charges, the pretrial proceedings, including the formal investigation under Article 32, are separate from the trial." United States v. Mickel, 9 U.S.C.M.A. 324, 327, 26 C.M.R. 104, 107 (1958). "Once the case comes to trial on the merits, the pretrial proceedings are superseded by the procedures at the trial; the rights accorded the accused in the pretrial stage merge into his rights at trial." Id.

29. See United States v. Donaldson, 23 U.S.C.M.A. 293, 294, 49 C.M.R. 542, 543 (1975).

30. See Article 34, UCMJ, 10 U.S.C. § 834.

31. This Court has previously rejected a similar contention out of hand. See United States v. Hardin, No. 77 1605 (NCMR 28 February 1978), pet. granted 5 M.J. 251 (C.M.A.1978). Had the request in this case been granted, the result would have been the preparation of the third Article 34 advice letter in Frederick's case.

32. See Article 34, UCMJ, 10 U.S.C. § 834; para. 35b, MCM, 1969 (Rev.); United States v. Greenwalt, 6 U.S.C.M.A. 569, 20 C.M.R. 285 (1955).

first trial culminated in appellate reversal of findings and sentence[33] and where the appellate court announced that a rehearing may be ordered.[34] The function of the Article 34 advice letter is two-fold: (1) To aid in the determination of whether the charge alleges an offense under the code, and (2) to aid in the determination of whether trial is warranted by the evidence contained in the report of investigation.[35] Those two purposes have been amply served by both the unchallenged original pretrial advice letter and the original trial proceedings in this case. We perceive no Congressional intent to require the pointless, time-consuming formality here requested which is superseded by a clear showing that there were, in fact, sufficient grounds upon which to direct a relitigation of the issues originally presented.[36] The U.S. Court of Military Appeals authorized the general court-martial convening authority to order a rehearing in appellant's case. That officer was thus empowered to refer the amended charge[37] to trial based upon his mere discretion as to the practicality of such referral.[38] It may well be that as a predicate for the exercise of this discretion, the convening authority saw the need to be advised by legal counsel of matters which bore directly on the feasibility of trial, such as availability of witnesses and the accused, accessibility of evidence, and the cost of litigation, but that discretion does not embrace factual determinations concerning whether the case should have been tried at all and if so by what forum.[39] As these latter two considerations appear to be at the heart of appellant's assignment of error, we reject it on the premise that a legal system already over-burdened with procedural surplusage

should not be unreasonably hindered by an irrational and insensate rule. In short, no Article 34 advice letter was required prior to the rehearing in this case.

## IV

At the initial Article 39(a)[40] session of the rehearing held on 31 August 1977, the detailed defense counsel posited that in the defense's view there was no issue as to appellant's mental capacity at the time of the rehearing but there was a significant question as to appellant's mental responsibility at the time of the offense. During this first session, appellant, through counsel, requested an examination by a qualified neurologist and production by the Government of a list of forensic psychiatrists within the armed forces, such list to include the Coast Guard. The request for a neurological consultation, including the use of an electroencephalogram, was renewed at the next Article 39(a) session held the following day. The military judge granted this defense request and immediate steps were taken by the Government, through trial counsel, to comply therewith. Six days later, trial counsel informed the military judge that arrangements had been made for appellant to receive an electroencephalogram the next day, the results of which would accompany appellant to a neurological consultation scheduled two days hence. At the next Article 39(a) session held on 13 September 1977, the neurological report, based upon examination of appellant on 9 September in conjunction with the electroencephalogram results, was placed before the military judge. That report, *inter alia*,

33. *Compare* para. 35*b*, *with* para. 92*a*, MCM, 1969 (Rev.). We note that apparently the only officer whom the convening authority need consult in cases of rehearings is the trial counsel. *See id.*, para. 92*a*.

34. *See e. g., United States v. Frederick, supra,* at 3 M.J. 238.

35. Article 34(a), UCMJ, 10 U.S.C. § 834(a); para. 35*b*, MCM, 1969 (Rev.).

36. *Cf., United States v. Greenwalt, supra,* at 6 U.S.C.M.A. 572, 20 C.M.R. 288.

37. *See* Article 63(b), UCMJ, 10 U.S.C. § 863(b); para. 92*a*, MCM, 1969 (Rev.).

38. *See* Article 67(f), UCMJ, 10 U.S.C. § 867(f); para. 92*a*, MCM, 1969 (Rev.).

39. *Cf., United States v. Porter,* 1 M.J. 506, 510 (A.F.C.M.R.1975), *citing United States v. Foti,* 12 U.S.C.M.A. 303, 30 C.M.R. 303 (1961).

40. Article 39(a), UCMJ, 10 U.S.C. § 839(a).

reflected that there was no indication of epilepsy or organic brain disease in appellant and that further neurological work-up was not deemed necessary.

Over two weeks later, on 26 September 1977, the formal report of the results of appellant's electroencephalogram was placed into the record as an appellate exhibit. At this time the parties were still litigating the availability and assignment of an individual military counsel of appellant's selection to aid in appellant's defense. Approximately three weeks later, on 18 October 1977, detailed defense counsel, by written request addressed to the convening authority, sought to have appellant examined by a psychiatrist, a psychologist, and a neurologist of the defense's choosing and at Government expense. In the same correspondence, the detailed defense counsel sought to preclude trial counsel from ascertaining who these potential defense witnesses would be.[41] Subsequent to the convening authority's denial of this request on 21 October 1977, owing in part to the availability of five psychiatrists and two clinical psychologists, all of whom were in Government employ at the situs of trial, defense counsel raised the issue again at another Article 39(a) session held on 21 October 1977. At this session detailed defense counsel sought to bolster his position with the assertion that two of the witnesses, who were at the core of defense's letter request to the convening authority, believed that the electroencephalogram performed on appellant should have been done with a nasal pharyngeal lead, the absence of which, in these experts' opinions, cast doubt on the validity of the completed medical procedure. Additionally, it was contended by the defense that a CAT-scan of appellant's brain should have been performed prior to the neurological consultation. In essence, trial defense counsel argued that further neurological testing was indicated to the

two medical experts contacted by appellant because the prior procedures were deemed by them to be materially deficient in light of asserted new developments in the field of psychiatry and neurology during the interim between appellant's first trial and the rehearing. Succinctly, appellant's legal champion at trial believed that appellant might have an organic brain disease or defect which could possibly be discovered through the use of the aforesaid additional medical techniques, although he conceded that to date appellant had been subjected to all of the medical tests that would normally be given; however, that advocate opined that appellant's was not the normal case, that further tests were required, and that appellant was willing to absorb some of the cost of these tests and of the examinations conducted by the three requested defense experts. After detailed defense counsel furnished the trial court with letters from the psychiatrist and clinical psychologist in question, which supported the request for additional medical testing of appellant, the military judge treated the defense request as a motion for a continuance, granted that motion, and "strongly suggested" that the Government cooperate in effecting the testing and examination of appellant by his chosen experts.

When the next Article 39(a) session was convened on 23 November 1977, appellant had been tested and examined by these experts, and the defense asserted that they would be prepared to go to trial on the merits on 12 December 1977. However, owing to uncertainty respecting the schedules of the defense expert witnesses and docket commitments of the trial judge, trial was ultimately set for 3 January 1978. Further Article 39(a) sessions consumed the initial 2 days of trial and were devoted to diverse matters including litigating the voluntariness of four pretrial statements al-

41. In pertinent part the correspondence states that "[t]he General will note that this letter lacks details as to who the defense witnesses might be and what they might say. This is due to the fact that the defense requests that the General give the defense permission to provide the required detail in such a way that the

Government counsel in this case will not have knowledge of who the accused is to see and why specifically there is a need to see these persons." The *sub silentio* reference to *United States v. Carpenter*, 1 M.J. 384, 386 n.8 (C.M.A. 1976) is obvious.

legedly attributable to appellant. On the third day, 5 January 1978, appellant, through counsel, moved for a continuance in order to have a pneumoencephalogram and a tomogram performed on appellant. Counsel also represented that these tests could be performed at Duke University, Durham, North Carolina,[42] possibly the following day, and that appellant lacked the funds to pay for these additional tests. Upon inquiry by the military judge as to the reason for such a request at that time in light of the examinations conducted on appellant the preceding November, detailed defense counsel launched a lengthy explanation[43] which eventually persuaded the military judge to order that the two additional tests be performed at Government expense and that preliminary stages of trial continue concomitantly with this being done. Following a recess at the same Article 39(a) session, detailed defense counsel represented to the military judge that he had telephonically communicated with

---

**42.** The situs of trial was Camp Lejeune, Jacksonville, North Carolina.

**43.** We set out the following merely to highlight one of the myriad problems faced by all trial participants when a psychiatric defense is in the offing:

DC: Your honor, the defense is perfectly willing to put on the record the reason for this; we have already spoken to the government about this, yesterday, within an hour or two of it becoming, or of the defense counsel becoming aware of the situation. It seems that an EMI-scan, also called a CAT-scan, was done on the accused at the University of Maryland Medical School, Baltimore. This was read by a doctor there who we never talked to, and provided to a neurologist; the neurologist was apparently not someone that read any scans, but it was apparently that our doctor relied upon other doctors to read them, and then communicate to her what the information was. We have yet to receive that document, although we have put a lot of money into it, have yet to receive her report. In any event, defense counsel was reading background material on the area, and happened to come across the name of Doctor MARK, so defense counsel called Doctor MARK—this was last week—and asked him if there was anything new in this particular area which he had a great expertise. Doctor MARK being at the Harvard Medical School, and also Chief of Neurosurgery at Boston City College, Boston City Hospital. Doctor MARK was read certain parts of the information that we had received from this other person, and he said, "Well I believe that person is in error; in regards to that EMI-scan, I don't believe, as you read it to me, that it's correct. Why don't you send me a copy of that and I'll be happy to read it for you." So, defense counsel, on Friday, the same day that this took place, arranged for the University of Maryland, somebody at the University of Maryland Medical School, a Doctor WU, W–U, to forward that to Doctor MARK, apparently a recognized expert on reading these items, and he read it, and he says along with consultation with one of his colleagues, and he said that while he could not diagnose the accused based upon that EMI-scan, as having a brain defect, that there was a, I believe his words were, significant chance, that, given these other two tests, the pneumoencephalogram and the tomogram, that depending on what they show of course, that he might be able to diagnose the accused as having an organic brain defect, and that's where we're at. At this time he would say there is a significant chance; he can't, in honesty, say that there is in fact a brain defect. That is why the lateness of the hour that we bring this up. It was pure chance that defense counsel even found out that there had been an error in the reading of the first one. Now, our psychiatrist, of course, is going to talk to the neurosurgeon in question, Doctor MARK, and we have that much but, according to Doctor MARK, there might be more. He can't say. (R. 192).

\* \* \*

MJ: What's your witness status?
TC: Sir, we have currently available in town six witnesses, three of whom have come from Hawaii, California, Connecticut, respectively; they are NIS agents and they will be here for the duration of this trial. We have coming in Monday from Hawaii, California, and Mississippi, both military and civilian witnesses who have been subpoenaed, who have been forwarded checks, who have arranged their schedules; we have appearing Monday an expert pathologist, who has arranged his schedule to be here to testify; we have, of course, coming Tuesday the government's psychiatrist, who has arranged his schedule to be available on that day, and for the next two days following, and, quite frankly, the government isn't sure if we can do the administrative things necessary to even get the accused to Duke University, or wherever, tomorrow morning. Certainly we have the power to cut through policy decisions and that kind of thing, but there are certain requirements that must be met; appropriations data, cutting orders, arranging for transportation, and this just takes some time to do. (R. 193).

medical authorities at Duke University and was informed that the two medical tests in question could not be performed for six weeks and it was recommended that three other named medical facilities be contacted with a view toward conducting the examinations. Defense counsel also represented to the military judge that a day of hospitalization both before and after the day of testing was medically indicated. Again, the military judge directed that the tests be performed at any medical facility available, either Government or civilian, at the earliest possible moment. Thereupon followed the entry of appellant's pleas of not guilty and selection of a panel of officer members who would ultimately decide appellant's fate.

The next Article 39(a) session was held on 9 January 1978, and devoted entirely to the matter of appellant's request for a pneumoencephalogram and tomogram. It appeared that no medical practitioner contacted by the parties had the capability to perform the requested examinations in the precise manner mandated by Dr. Mark, save that expert himself.[44] Again, the military judge indicated that efforts continue to secure the desired testing of appellant, although he evidenced some misgivings concerning the requirement for these tests, such concern generated by the reluctance of several medical practitioners to perform them on the basis of their questioned utility

for the purpose sought. With the case in this posture, the proceedings abated and resumed the following day to deal with the admissibility of certain photographs of the victim, various administrative matters, and the commencement of the Government's case-in-chief. Following the noon recess, at a point not far removed from the expected termination of the prosecution's case, the defense made another motion for a continuance to permit medical testing of appellant; however, action on the motion was temporarily sidetracked owing to the members' request for the recall of a Government witness who could not then be located. When the defense motion for a continuance surfaced again, later that day, with defense's psychiatrist and clinical psychologist scheduled to arrive and give testimony in less than 24 hours, the military judge, eschewing further delay, denied the motion. It is with this action that appellant presently takes issue.

We have recently addressed a similar complaint and in so doing set out the standard against which a denial of a requested continuance must be measured:

It is well-settled that the issue of whether or not a continuance should be granted is a matter resting within the sound discretion of the military judge, that his ruling is a proper subject for appellate review for his abuse of that

---

44. The following excerpt from the record is illuminating in this regard:

DC: It seems, Your Honor, that the type of pneumoencephalogram and tomogram that have to be done have to be done simultaneously and they need to be done on what is called a polytomes machine and apparently that's a chair that allows the patient to be rotated in a manner that when the air is in the ventricles in the head he might be x-rayed tomographically and apparently he has to be positioned very precisely and kept in a very precise position so that things can be done in a nice orderly manner and that all the area of the brain will be plain to those reading the x-ray. Apparently what they would have to do in New Bern to do the tomogram and the pneumoencephalogram simultaneously would be to physically move the x-ray machine around or physically move FREDERICK. In other words, have him lying on a table and move the table around the

machine. In any event they couldn't get the quality that Doctor MARKS would desire and that we would still have the same problem when we got done perhaps, of saying to the Government, 'Well, you did it, its nothing conclusive, and we want further tests.' and in other words the way they would do it in New Bern, Doctor WILLFONG said, would not be conclusive and that it should be done with this polytomes machine.

\* \* \* \* \* \*

So defense counsel, in total, has tried the University of North Carolina, which doesn't have the capability, Duke, which has the capability but it would take about six weeks, the Veterans Administration Hospital at Durham which would also take about two to three weeks, the Bethesda Naval Hospital, which would not admit him until about the 23rd, and Portsmouth Naval Hospital which doesn't have the capability. (R. 240–241).

discretion, and that he remains accountable for any resulting prejudice to an accused's substantial rights. *United States v. Thomson*, 3 M.J. 271 (C.M.A.1977); *United States v. Dunks*, 1 M.J. 254 (C.M.A.1976). A trial judge should err on the side of liberalism in taking action on such a motion where there exists good cause for any ensuing delay. *See Dunks, supra* at 255 *citing United States v. Daniels*, 11 U.S.C.M.A. 52, 55, 28 C.M.R. 276, 279 (1959); *United States v. Nichols*, 2 U.S.C.M.A. 27, 36, 6 C.M.R. 27, 36 (1952). Once he has acted, our scrutiny will be directed to those matters properly before him which bore directly on his final determination. *Cf., United States v. Quinones*, 1 M.J. 64 (C.M.A.1975).

*United States v. Furgason*, 6 M.J. 844, 847 (N.C.M.R.1979). Applying this standard to the case at bar, we refuse to hold that appellant's substantial rights were prejudiced or even that the military judge abused his discretion. Appellant's request for delay came well after the eleventh hour[45] at a time when his own experts had already formulated their opinions and were on the verge of traveling considerable distances to the situs of trial in order to place these opinions before the fact-finder. Government witnesses had been garnered from far-flung locations. A panel of court members had been selected and seated. The parties had been in the throes of litigation for a period exceeding 4 months. There was disagreement on the part of various medical practitioners concerning the utility of the two additional tests requested to the particular defense sought to be raised. Moreover, there was never proffered by the defense any reliable indication

as to when these tests would in fact be conducted by Dr. Mark, how long it would take for him to formulate his opinions, whether it would be necessary for him to testify at trial, whether the defense's other two medical experts could incorporate his findings in their opinion testimony, and when these latter two witnesses would again be available if trial were further delayed. As we view the matter, appellant for practical purposes, was requesting an indefinite continuance. To this he was not entitled[46] for under the circumstances here presented any additional delay for the purpose of appellant's medical testing would have been unreasonable. We believe that the military judge carefully weighed all of the competing factors which bore upon his decision, as was his duty, and we conclude that he did not abuse his discretion.[47]

Even assuming, *arguendo*, a contrary conclusion, appellant's position would not be enhanced. On cross-examination, the defense forensic psychiatrist, Dr. Ratner, admitted that the CAT-scan procedure is open to numerous interpretations by various qualified medical practitioners, that it showed only appellant's current function at the time of the examination in late 1977, and that there were no measures available with which to compare this function as of the time of the alleged offense. In response to questions propounded by the military judge outside the presence of court members, Dr. Ratner indicated that Dr. Mark was consulted owing to the fact that appellant's CAT-scan "was not particularly compatible with some of the other evidence that we had accumulated." Dr. Ratner admitted that the two additional tests, the

45. In *Furgason, supra*, we paused to note that: Even where such a request could not ordinarily be considered as made in a timely fashion, this Court has adopted an *ad hoc* approach wherein each case is determined on its inherent facts, *see United States v. Roberts*, No. 71 0926 (N.C.M.R. 8 February 1972) and cases cited therein, and where it is clear that the ends of justice will best be served by the granting of the motion the trial judge acts at his peril in denying it. *See United States v. Odle*, No. 71 0649 (N.C.M.R. 28 July 1971); *see also United States v. Morgan*, No. 76

0233 (N.C.M.R. 17 August 1976) and cases cited therein; *but see United States v. Mortuiccio*, No. 71 0496 (N.C.M.R. 16 July 1971). *Id.* at n.12.

46. *See Roberts* and *Odle*, both *supra; see also* Article 40, UCMJ, 10 U.S.C. § 840; para. 58*b*, MCM, 1969 (Rev.).

47. *Cf., United States v. Furgason, supra; United States v. Kilby*, 3 M.J. 938 (N.C.M.R. 1977); *United States v. Somerville*, 48 C.M.R. 885 (N.C.M.R.1974).

pneumoencephalogram and the tomogram, were not seriously considered by the team of defense medical experts until suggested by Dr. Mark, and that it was "an issue of judgment" as to whether the additional tests would have been helpful to an appreciable degree. Dr. Ratner also indicated that at the time he formed his opinion of appellant's mental condition as of the time of the alleged offense, he saw no need to have appellant examined further and was still unwilling to say that additional testing was a necessary predicate to the formulation of an accurate psychiatric opinion on that subject. After this representation by Dr. Ratner, the military judge gave trial and defense counsel an opportunity to question the expert witness with a view toward eliciting additional information which might cause the military judge to alter his position on the defense request for a continuance. Both counsel declined. Subsequently, the Government's forensic psychiatrist, Dr. Thrasher, testified in rebuttal, basing his opinion of appellant's mental condition on examinations conducted over a three-day period approximately 2 months after the commission of the alleged offense. In Dr. Thrasher's opinion, appellant was mentally responsible for his complicity in the homicide. Essentially, both Dr. Ratner and Dr. Thrasher agreed that at the time of the alleged offense appellant had a mental disease or defect; they disagreed, however, as to whether as a result of that disease or defect appellant lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. The court members resolved the issue against appellant. The defense's chief medical expert indicated that further testing was unnecessary for the formulation

of his opinion and related testimony. Likewise, the Government's expert believed that he possessed adequate data upon which to base his contrary opinion. The determination of the sufficiency of the underlying medical facts was correctly left to those best able to make that decision.[48] Appellant has suffered no prejudice as a result of the claimed judicial infraction.

## V

Appellant also complains that he suffered substantial prejudice due to the military judge's failure to properly adjudicate the defense motion to suppress certain pretrial admissions allegedly attributable to appellant. The first of these statements was uttered by appellant to a member of the Jacksonville, North Carolina, police department at approximately 0200 hours on 25 February 1974, while appellant was in the process of attempting to locate the local chief of police. According to the witnessing officer, appellant entered the police station carrying an infant, and, on his own volition, proceeded to the door of the chief of police's office; upon nonaccusatory inquiry by the officer as to appellant's business at that hour, appellant replied "I want you to take this child, I just killed its mother." Under the circumstances here presented we find this statement wholly admissible.[49] Likewise, there was no legal impediment to the admission of appellant's oral and non-verbal statements[50] related to the two other civilian police officers who appeared on the scene almost immediately thereafter in response to a radio call initiated by the first officer. The record is replete with references to the attempts by these two police

---

**48.** *See United States v. McGee*, 36 C.M.R. 785, 795 (N.B.R.1966).

**49.** The precise issue was determined over a decade ago with no intervening authority known to the contrary: "There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not effected by

our holding today." *Miranda v. Arizona*, 384 U.S. 436, 478, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966), *citing People v. Dorado*, 62 Cal.2d 338, 354, 42 Cal.Rptr. 169, 179, 398 P.2d 361, 371 (1965).

**50.** Upon leaving the police station the appellant led police directly to the scene of the crime where the body of the victim was found under circumstances which affirmatively precluded accident or misadventure as the cause of death.

officers to have appellant refrain from talking until he had been advised of his custodial interrogation rights. Whether we choose to view the setting as custodial [51] or noncustodial [52] the result is the same—the disclosures originating with appellant were properly admitted against him at trial, as were the subsequent confessions to two agents of the Naval Investigative Service obtained during successive interviews later that same morning and preceded by the required warnings. [53]

Appellant would have us believe that at the time all of these incriminating statements were made, his mental state precluded his awareness and appreciation of the fact of incriminating himself and the associated failure to comprehend the full meaning and significance of what he was being told concerning his right to refrain from so doing. Thus, appellant would have us hold that his statements were in fact *involuntary* and therefore inadmissible as evidence against him. At trial, individual military counsel, in part, grounded his objection to the admission of these statements on appellant's alleged mental irresponsibility at the time that the statements were made. [54] Appellant chose to present no evidence when his suppression motion was litigated, relying instead upon the Government's evidence being viewed in a light favorable to him. On appeal, appellant has apparently switched horses and is seeking to predicate involuntariness on some functional equivalent of diminished capacity. [55] We are convinced that the military judge properly resolved the issue of voluntariness against appellant. We are also convinced that when the military judge submitted that issue to the court members he did so under proper instructions. [56] As we view the record as a whole, appellant has suffered no prejudice. [57]

## VI

Appellant's final assertion of error here is that he was substantially prejudiced by the military judge's failure to grant the defense equal access to witnesses in violation of the mandate of Article 46, Uniform Code of Military Justice. [58] As noted above, [59] the defense request that the convening authority allow appellant to be examined by a psychiatrist, psychologist, and neurologist of the defense's choosing and its request that the defense be permitted to provide the convening authority the names of those witnesses and synopses of their testimony in a manner which would foreclose disclosure of this information to trial counsel, thus preserving the veiled substance of appellant's defense, were denied. Subsequently, the defense moved for an *ex parte* proceeding with the military judge so

51. *See Miranda, supra.*

52. *See Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S.Ct. 711, 714, 50 L.Ed.2d 714, 719 (1977).

53. All four of the verbal statements were held admissible to impeach appellant during cross-examination during his first trial. *See Frederick, supra,* 3 M.J. at 233 n.5.

54. Record, at 125, 185.

55. Appellant's brief at 18.

56. Record, at 447–450. Until now, there has never been any finding or allegation which brought into question appellant's mental capacity, as contradistinguished from his mental responsibility. Further, there is no evidence of record which would even remotely indicate or suggest that appellant, at the time the challenged statements were made, was irrational or otherwise suffering from any mental infirmity giving rise to a diminution of rational intellect which would have deprived him in any degree of the cognitive and volitional ability to refrain from making the incriminating statements had he desired to do so. *Cf. Eisen v. Picard*, 452 F.2d 860 (1st Cir. 1971). In other words, assessing the totality of the surrounding circumstances, there is nothing to indicate that at the time the statements were made appellant's capacity for self-determination was critically impaired or that his statements were not the product of an essentially free and unconstrained choice and therefore involuntary. *Cf. Schneckloth v. Bustamonte*, 412 U.S. 218, 223–227, 93 S.Ct. 2041, 2045–2047, 36 L.Ed.2d 854, 860–862 (1973).

57. *United States v. Erb*, 12 U.S.C.M.A. 524, 536–537, 31 C.M.R. 110, 122–123 (1961).

58. 10 U.S.C. § 846.

59. *See* note 41, *supra*, and accompanying text.

that the application for the witnesses could be made without disclosure to the trial counsel. The military judge denied the motion, and properly so,[60] indicating that if he were furnished with facts which would tend to show the necessity for further testing then he "would expect the Government to take care of it." At this point the defense disclosed the identity of their prospective witnesses and summaries of their preliminary opinions concerning appellant's mental responsibility at the time in question. Appellant, obviously, has no quarrel with the fact that the services of these medical experts were not provided. What he does object to, however, is the action of the military judge which, in appellant's opinion, required the defense to disclose its medical case—in the defense's view, its entire case—in advance, a procedural resultant which inured to his substantial prejudice.

In detailed defense counsel's letter request to the convening authority, the touchstone of appellant's contention was that "[t]o divulge these facts to the Government counsel would substantially impair the ability of the defense counsel to adequately defend the accused and would be a violation of Article 46 of reference (a) [UCMJ] which gives each party in a military trial equal opportunity to obtain witnesses." At trial, the defense position seemed to crystalize somewhat [61] and succeeded in convincing the military judge that favorable action should be taken on this defense request. Appellant ultimately received all the benefits sought, save keeping trial counsel uninformed as to who the potential defense witnesses were and what their putative testimony would be. We perceive his real objection to be that of discovery *timing, i. e.,* providing the Government with information in advance of the necessity for so doing, in that appellant has to date failed to delineate with specificity wherein he has suffered the asserted prejudice. If relevant and material, the much sought defense evidence would have been subjected to prosecution scrutiny sooner or later. Judicial efficiency alone would have demanded disclosure to the Government sufficiently in advance of the exercise of its right of cross-examination so as to give that right meaningful effect. Discovery in a criminal trial is not a one-way street.[62] Appellant sought

---

60. *See* § 1.6, The Function of the Trial Judge, American Bar Association Project on Standards for Criminal Justice (ABA, 1972); Canon 3 A(4), Code of Judicial Conduct (ABA, 1977); *see also United States v. Kennedy,* 8 U.S.C. M.A. 251, 24 C.M.R. 61 (1957); *United States v. Gardner,* 46 C.M.R. 1025 (ACMR 1972); *cf. United States v. Payne,* 3 M.J. 354 (C.M.A. 1977).

61. In response to a question propounded by the military judge to defense counsel aimed at ferreting-out the rationale underlying the defense request, the following appears of record:

DC: Well, Your Honor, we have consulted with prospective witnesses and two of them we have talked to in person having taken a trip last weekend to the Washington, D.C., area. We do feel the identification of the witnesses is a very important matter in that the Government might end up subpeonaing (sic) the witnesses for their own case. We have an idea what the witnesses will say. We believe the witnesses will sort of support our position, but these are professional men and they call them as they see them. Now, right now they seem to think that they would call them as the defense sees them, but possibly after further examination they would come up with stuff that would help the

Government. And we do not want to tell the Government who we have talked to because at a later time they might subpoena them themselves. We don't think that's unreasonable, sir. Even their identity is important and we would tell the identity to the Commanding General or the Military Judge or whomever feel they want to keep [trial counsel] in the dark. (R. 97–98).

62. The prosecution right of discovery in cases where an accused raises the defense of lack of mental responsibility is widely recognized. Reflecting the trend which supports the view that proper adjudication is a function of evenhanded accessibility to evidence is federal legislation, *see* F.R.Crim.P. 16(b)(1)(B), and statutory mandate and case law applicable to almost one-fourth of the State jurisdictions, *see* Ala. Code Ann. tit. 15, § 15–16–22 (1977); Alaska Stat.Ann. § 12.45.087 (1972); Ariz.R.Crim.P. 11.4 (1973); Colo.Code Crim.P., Art. 8, § 16–8–106 (1974); Conn.Gen.Stat.Ann. § 54–40(b) (1977); Idaho Code Ann. § 18–211(3)(e) (1978); Mo.Stat.Ann. § 552.020.4 (Supp.1979); Vt.Stat. Ann. tit. 13, § 4816 (1974); Va.Code Ann. § 19.2–169 (1975); Wyo.Stat.Ann. § 7–241(a) (1957); *People v. Blank,* 64 Misc.2d 730, 315 N.Y.S.2d 647 (1970); *State v. Sauls,* 224 La. 1063, 71 So.2d 568 (1954). Also in accord with

to turn the proceedings into a jurisprudential game of hide-and-seek instead of a search for the truth.[63] To this he was not entitled. The request came approximately 7 weeks after the initial Article 39(a) session in the case, at a time when both parties had a right of access to that evidence which bore directly on the justiciable issues. The prosecutor was never in a position to take or refrain from taking any action on the request.[64] The military judge substantially conformed his ruling to the defense desires, thereby erasing any interference with appellant's request for witnesses at a time when an otherwise improperly required advance disclosure of the defense's case had long since passed.[65] The assignment of error is rejected.

Accordingly, the findings and sentence are affirmed.

Judge GRANGER concurs.

BAUM, Senior Judge (dissenting):

The three expert witnesses who testified in this case, two for the defense and one for the Government, while not in agreement on the exact nature of appellant's mental condition, did agree unanimously that appellant was suffering from a mental disease or defect at the time of the offense. They disagreed, however, as to the effect of his condition. The Government witness was of the opinion that appellant did not lack the substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. On the other hand, the defense witnesses believed appellant lacked both the capacity to appreciate the criminality of his conduct and to conform his conduct to the requirements of the law. The conclusions of the defense witnesses were based in large part on objective tests that the Government witness failed to administer when examining appellant and formulating his opinions. After weighing all this evidence, I am not convinced beyond a reasonable doubt that the appellant was mentally responsible at the time of the offense. Accordingly, I would reverse.

this trend are the provisions of the Model Penal Code. *See* Model Penal Code, art. 4, § 4.05(3) (Proposed Official Draft, 1962). It should be noted that the totality of the prosecutorial evidence was available to the defense since before the commencement of appellant's first trial.

63. *See Estes v. Texas*, 381 U.S. 532, 540, 85 S.Ct. 1628, 1631, 14 L.Ed.2d 543, 549 (1965), *rehearing denied*, 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed.2d 118 (1965); *cf. United States v. Wolfe*, 8 U.S.C.M.A. 247, 250, 24 C.M.R. 57, 60 (1957).

64. *Cf. United States v. Carpenter*, 1 M.J. 384, 386 n.8 (C.M.A.1976).

65. *See United States v. Arias*, 3 M.J. 436, 438 (C.M.A. 1977).