**UNITED STATES**

v.

**Darrell M. JONES, 415 19 8621,
Disbursing Clerk Seaman
(E–3), U.S. Navy.**

**No. NMCM 84 2397.**

U.S. Navy-Marine Corps Court of
Military Review.

12 July 1985.

LCDR Frederick N. Ottie, JAGC, USN, Appellate Defense Counsel.

LT Daniel Lippman, JAGC, USNR, Appellate Defense Counsel.

MAJ E.D. Clark, USMC, Appellate Government Counsel.

Before GORMLEY, C.J., and KERCHEVAL and BARR, JJ.

GORMLEY, Chief Judge:

Tried by a general court-martial constituted of military judge alone, appellant, contrary to his pleas, was convicted of a 14-day unauthorized absence and four specifications of possessing and distributing the controlled substance methamphetamine, in violation of Articles 86 and 134, respectively, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 886 and 934. He was sentenced to a dishonorable discharge, confinement at hard labor for five years, forfeitures of $400.00 pay per month for six months, and reduction to pay grade E–1. The convening authority approved the sentence as adjudged.

Appellant has assigned eight errors for our consideration. In light of our disposition of Assignment IV, we need not address Assignments VII and VIII. Furthermore, because a rehearing may be ordered, it is premature to reach Assignments I and VI which ask us to test the sufficiency of the evidence to support appellant's conviction of possessing and distributing a controlled substance.

Thus, the following assignments of error are discussed below:

## II

THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR IN REFUSING TO ORDER A NEW ARTICLE 32 INVESTIGATION DUE TO:

A. AN ISSUE OF IMPARTIALITY OF THE PRETRIAL INVESTIGATING OFFICER; AND

B. A DECLARATION THAT TWO NIS AGENTS WERE UNAVAILABLE TO TESTIFY AT THE ARTICLE 32 HEARING AND THE ACCEPTANCE INTO EVIDENCE OF THEIR SWORN STATEMENTS OVER DEFENSE OBJECTION.

## III

THE TESTIMONIES OF STEPHEN G. SIMPSON AND THOMAS J. GOODMAN WERE ERRONEOUSLY ADMITTED INTO EVIDENCE, OVER THE DEFENSE'S OBJECTION, INASMUCH AS THE GOVERNMENT FAILED TO COMPLY WITH THE JENCKS ACT.

## IV

THE MILITARY JUDGE ERRED TO APPELLANT'S SUBSTANTIAL PREJUDICE WHEN THE DEFENSE MOTION TO PRODUCE WITNESSES WAS DENIED.

## V

THE MILITARY JUDGE COMMITTED PREJUDICIAL ERROR IN DENYING APPELLANT'S MOTION TO COMPEL PRODUCTION OF REQUESTED DISCOVERY.

## I

### THE REFUSAL TO REOPEN THE ARTICLE 32 INVESTIGATION

#### A. IMPARTIALITY OF INVESTIGATING OFFICER

Lieutenant Commander Dawson was originally assigned as the investigating officer in the appellant's Article 32, 10 U.S.C. § 832, investigation but was relieved by Lieutenant Commander Lawlor on the date of the hearing. The Article 32 hearing was held and completed on 19 December 1983. Subsequently, on 31 December 1983, Lieutenant Commander Lawlor presided as the military judge in the special court-martial of Dagmarr Hammie, one of the witnesses whose statements he had to consider in his investigation of the charges against the accused Jones. Hammie was involved in Jones's 32 through the introduction of a statement of hers which implicated the appellant and a sailor named White in the distribution of controlled substances, and through the introduction of subsequent statements which retracted that earlier statement. Specifically, Investigating Officer's Exhibits (IOE) 7 and 8 consisted of a *Results of Interview* and a sworn and signed statement, dated 1 April 1983 and 4 April 1983, respectively, in which Hammie related to the Naval Investigative Service (NIS) that Jones and White were the principal suppliers of methamphetamines and marijuana. IOE's 9 and 10 consisted, respectively, of a typed statement, signed by Hammie and dated 27 September 1983, in which she retracted those earlier accusations as to both Jones and White, and of an extract from White's Article 32 hearing, dated 19 October 1983, in which Hammie again retracted her earlier accusatory statement. At her special court-martial, Hammie was charged in the alternative with, among other things, making a false official statement that Jones and White were involved with drugs, and perjuring herself at White's Article 32 when she retracted that earlier statement. She pled guilty to the perjury charge and, after conducting the appropriate inquiry into the providency of her plea, the military judge, Lieutenant Commander Lawlor, entered findings of guilty in accordance therewith. Subsequently, on 4 January 1984, Lieutenant Commander Lawlor submitted his recommendations that the charges against Jones be referred to a general court-martial.

The appellant in the instant case now claims that he was deprived of an impartial pretrial hearing because of the investigating officer's involvement as military judge in the perjury trial of key witness Hammie. Appellant's claim is based on the fact that the investigating officer was privy to Hammie's plea of guilty, and, in fact, as military judge, had to make findings with respect to its providence, *prior* to the submission of his report regarding the disposition of the charges in the Jones case. Because of this exposure to evidence relating to the Jones case, outside the boundaries of the Article 32 hearing, appellant claims that he did not have an impartial hearing and requests that this case be remanded so that he might be afforded this substantial right.

Although we are sensitive to appellant's concerns with respect to the facts surrounding this assignment of error, we disagree with his conclusion. It is well established that "[a] military judge may try companion cases" and that "mere exposure to related cases alone is not disqualifying." *United States v. Wager*, 10 M.J. 546, 550 (N.C.M.R.1980) (citing *United States v. Lewis*, 6 M.J. 43 (C.M.A.1978) and *United States v. Jarvis*, 22 U.S.C.M.A. 260, 46 C.M.R. 260 (1973)). It may be appropriate for the officer who presided as military judge at the trial of one co-actor to conduct the Article 32 investigation into charges preferred against a possible confederate so long as the exercise of his function at the trial proceeding "does not impair his impartial consideration of the evidence developed" in the Article 32 investigation. *Wager, supra*, at 551. While continuing the pretrial investigation witness' (Hammie's) special court-martial until after the submission of the *Jones* Article 32 investigative report would have avoided the appearance of any impropriety in the instant case, we find that the investigating officer did not compromise his impartiality by sitting as the military judge in the *Hammie* case. Nothing in the record indicates that Lieutenant Commander Lawlor allowed his exposure to the Hammie court-martial to influence his recommendation concerning the disposition of the charges against Seaman Jones. His report, in fact, evidences strict neutrality. He recommended that five of the ten specifications under the Article 134 drug charge be dropped and openly discussed the weaknesses of the government's case. We find that the Hammie special court-martial did not enter into his consideration of the evidence presented at the Jones Article 32 investigative hearing. Thus, we conclude that appellant received an impartial pretrial hearing under Article 32.

B. ACCEPTANCE OF SWORN STATEMENTS OF NIS AGENTS AT ARTICLE 32 HEARING OVER DEFENSE OBJECTION

█ At the Article 32 investigative hearing, government counsel offered the sworn statement of two NIS agents which described an interview of the appellant during which he allegedly admitted being involved with the distribution of methamphetamines. Appellant objected to the admission of the sworn statement and requested the presence of the NIS agents at the hearing. After considering evidence concerning the difficulty and expense of obtaining the presence of the agents, the investigating officer declared them unavailable for purposes of the Article 32 investigation and accepted their sworn statement as an investigative exhibit. At trial, appellant moved to reopen the Article 32 investigation to allow the presentation of the live testimony of the two agents. The military judge denied the motion.

The evidence presented at the investigative hearing and on the motion at trial revealed that (1) the two NIS agents were assigned to duty at Norfolk, Virginia—about 8000 miles from the site of the Article 32 hearing (Yokosuka, Japan); (2) they had extremely heavy workloads which precluded their personal attendance at the hearing; (3) the appointing authority had elected not to provide funding for their travel; and, (4) the cost of their attendance would be very high. Additionally, when the motion was heard at trial on 6 February 1984, appellant's defense counsel stipulated that the two agents had been in Yokosuka since 26 January and that he had interviewed them at least twice.

In *United States v. Ledbetter*, 2 M.J. 37 (C.M.A.1976), the Court of Military Appeals applied a balancing test to determine witness availability for the purposes of an Article 32 investigation. "The significance of the witness's testimony must be weighed against the relative difficulty and expense of obtaining the witness's presence at the investigation." *Id.* at 44. In the instant case, the investigating officer's report thoroughly discussed the issue of the unavailability of the NIS agents. We find that the investigating officer correctly applied the *Ledbetter* balancing test to the

evidence presented with respect to appellant's request for the personal attendance of the government witnesses. Additionally, we find that there was no prejudicial denial of the appellant's motion to reopen the Article 32 since appellant was able to interview the witnesses before trial. *See United States v. Cumberledge*, 6 M.J. 203 (C.M.A.1979) and *United States v. Capel*, 15 M.J. 537 (A.F.C.M.R.1982).

## II

### REQUEST FOR DEFENSE WITNESSES

A. *FACTS:* At an Article 39(a) session, 10 U.S.C. § 839(a), the defense made a motion for appropriate relief requesting the production of the following defense witnesses: Ensign M.A. Vaca, Yeoman Chief J.R. Gebhardt, Personnelman Senior Chief J.I. Miller, Yeoman Third Class T.L. White, Personnelman Third Class M. Carignan, Personnelman Seaman D.M. Hammie.[1] Appellate Exhibit XI. Defense had previously made timely requests for witnesses Vaca, Gebhardt, Miller, and Carignan but these requests had been denied by the convening authority. (*See* attachments 1, 4, and 7 of Appellate Exhibit XI and Appellate Exhibit XII–1 [2]). In its motion at trial, the defense urged that these witnesses were essential to the defense's case on the merits in that they would testify with regard to their opinion, and their knowledge of the reputation of the appellant's character for truthfulness, and of his good work performance and good general military character. Defense also stated that witness Carignan, a former roommate and co-worker of the appellant, would testify that appellant was not involved with drugs while he lived and worked with him. The military judge, after hearing arguments by counsel and considering their briefs, denied the defense motion.

Appellant now claims that his right to compel witnesses to appear on his behalf, as guaranteed by Article 46 of the UCMJ, 10 U.S.C. § 846, was abrogated by the military judge's denial of his motion and that this constituted prejudicial error necessitating that this Court set aside the findings and sentence of the court below. After conducting an exhaustive examination of the record of trial and the case law in this area, we agree with the appellant that the military judge did abuse his discretion and that this error resulted in prejudice to the appellant which requires us to set aside the findings and sentence.

■■■ B. *DISCUSSION.* Article 46, Uniform Code of Military Justice, 10 U.S.C. § 846, provides, in pertinent part, that "[t]he trial counsel, the defense counsel, and the court-martial shall have equal opportunity to obtain witnesses and other evidence in accordance with such regulations as the president may prescribe." In accordance therewith, it has been held that "[a]n accused has the right to compel personal attendance of a witness who, in the belief of the accused and his counsel, may offer proof to negate the Government's evidence or to support the defense." *United States v. Qualls*, 9 M.J. 662 (N.C. M.R.1980); *United States v. Iturralde-Aponte*, 1 M.J. 196 (C.M.A.1975); *U.S. Const.* amend. VI. This right, however, is not absolute and involves, among other things, consideration of the relevancy and materiality of the expected testimony. *United States v. Carpenter*, 1 M.J. 384 (C.M.A.1976); *Iturralde-Aponte, supra; United States v. Sweeney*, 14 U.S.C.M.A. 598, 34 C.M.R. 378 (1964); *United States v. Thornton*, 8 U.S.C.M.A. 446, 24 C.M.R. 256 (1957). Each case must be evaluated on an ad hoc basis in which the materiality of the testimony sought is weighed against the equities of the situation. *United States v. Ambalada*, 1 M.J. 1132 (N.C.M.R.1977); *Sweeney, supra.* In *United States v. Tangpuz*, 5 M.J. 426 (C.M.A.1978), the

---

1. Yeoman Third Class White did testify at the trial and Personnelman Seaman Hammie was to testify on charges that were dismissed, consequently this assignment of error is moot as it relates to the request for those two witnesses.

2. The request for Miller was initially approved but subsequently disapproved by the convening authority.

Court provided a "non-exhaustive list of relevant factors" determinative of when an accused is entitled to the personal attendance of a witness. The factors delineated by that Court were the following:

(1) the issues involved in the case and the importance of the requested witness to those issues;

(2) whether the witness was desired on the merits or on sentencing;

(3) whether the witness's testimony would be "merely cumulative";

(4) the availability of alternatives to the personal appearance of the witness such as deposition, interrogatories, or previous testimony.

*Tangpuz*, 5 M.J. at 429. A careful perusal of the case law leading up to and following *Tangpuz* reveals that the following can be added to this non-exhaustive list:

(a) unavailability of the witness, such as that occasioned by nonamenability to the court's process, *United States v. Bennett*, 12 M.J. 463 (C.M.A.1982);

(b) whether or not the requested witness is in the armed forces and/or subject to military orders, *United States v. Ciarlatta*, 7 U.S.C.M.A. 606, 23 C.M.R. 70 (1954); *United States v. Davis*, 19 U.S.C.M.A. 217, 41 C.M.R. 217 (1970);

(c) the effect that a military witness's absence will have on his or her unit and whether that absence will adversely affect the accomplishment of an important military mission or cause manifest injury to the service, *United States v. Manos*, 17 U.S.C.M.A. 10, 37 C.M.R. 274 (1967); *United States v. Davis*, 19 U.S.C.M.A. 217, 41 C.M.R. 217 (1970).

This by no means completes the factors to be considered but simply adds some considerations which have been confronted and ruled upon in the past. Other factors may well arise which could be added to this list.

The disposition of this assignment of error involves analysis of the above-enumerated factors with respect to the witnesses requested in this case and their expected testimony. The expected testimonies of witnesses Vaca, Gebhardt, and Miller, and their relationship to the appellant were virtually identical with one another. Additionally, all three were attached to the USS DETROIT which was deployed to the eastern Mediterranean in support of the multinational force in Beirut. For purposes of our analysis, therefore, the request for these three witnesses will be considered as one, and the request for witness Carignan will be considered separately. Our analysis leads us to the conclusion that the military judge did not abuse his discretion with respect to the denial of witnesses Vaca, Gebhardt, and Miller, but that he did abuse his discretion in failing to grant the appellant's motion to produce witness Carignan.

### 1. *Vaca, Gebhardt, and Miller*

a. *Issues in the Case:* The principal charge against Seaman Jones consisted of a number of specifications alleging possession and distribution of the controlled substance methamphetamine during the period 1 April 1982 to 12 January 1983. The government's evidence was primarily testimonial and consisted of two sailors who allegedly purchased methamphetamines from the appellant and who had been drug dependent. These two witnesses were enrolled in drug rehabilitation programs and were either testifying under a grant of immunity or effectively immune from prosecution due to their drug disclosure. The government also presented two NIS agents who had interrogated the accused and to whom the accused had allegedly made an oral confession. The appellant's evidence consisted of his own testimony denying the charge and decrying the alleged confession as a result of improper coercion, and of the testimony of a number of witnesses attacking the credibility of the government witnesses. The case's pivotal issue, therefore, the disposition of which was "virtually controlling on the question of guilt or innocence" since there was no physical or other evidence linking the appellant to drug activity, was one of credibility. *United States v. Cover*, 16 M.J. 800, 801 (N.M.C.M.

R.1983). If the trier of fact believed the government witnesses, the appellant would be convicted; if, on the other hand, the appellant successfully attacked the credibility of those witnesses, and if the trier of fact believed the appellant and his witnesses, the result would be an acquittal. In light of this circumstance, it became very important for the appellant to have witnesses who would present favorable opinion and reputation evidence concerning his character for honesty and truthfulness. Thus, we find that the expected testimony of the witnesses from the USS DETROIT— Vaca, Gebhardt, and Miller—was material to the issues in the case and was important to the resolution of those issues.

b. *Witness on the Merits or on Sentencing:* The witnesses were requested for testimony both on the merits and on sentencing.

c. *Cumulativeness of the Witnesses' Testimony.*

■ "If the testimony of a given witness is material, the live presence of that witness must be furnished or the proceedings abated, unless, in the sound discretion of the trial judge, the testimony of that witness would be merely cumulative to the testimony of other defense witnesses." *United States v. Williams,* 3 M.J. 239 (C.M.A.1977); *United States v. Scott,* 3 M.J. 1111 (N.C.M.R.1977). Besides the similarity of the requested witness's testimony to the testimony of witnesses whose personal attendance at trial is assured, factors which are to be taken into consideration in determining whether a requested witness's testimony is "merely cumulative" include:

(i) whether the requested witness's credibility is greater than that of the attending witness, *United States v. Jouan,* 3 M.J. 136 (C.M.A.1977);

(ii) whether the testimony of the requested witness is relevant to the accused with respect to character traits or other material evidence observed during periods of time different than that of attending witnesses, *Williams, supra* at 243;

(iii) whether there is any benefit to the accused from an additional witness saying the same thing that other witnesses have already said, *Williams, supra* at 243, n. 8; *Scott, supra* at 1113.

■ As evidenced by appellant's witness requests, and by the stipulations of expected testimony of the three witnesses which were admitted at trial, Vaca, Gebhardt and Miller were sought by the appellant to testify about their knowledge of the appellant with respect to his character for truthfulness, his good work performance, and general military character. At trial the accused offered the testimonies of Personnelman First Class Joseph and Personnelman Chief Nazareno concerning his good character for honesty and trustworthiness. Additionally, the defense offered documentation from the appellant's service record book as evidence of his work performance and military character. There was no noteworthy attack on the credibility of Joseph and Nazareno and nothing in the record indicates that their credibility was significantly less than that of the USS DETROIT witnesses. Although their expected testimony was based on observations of the appellant during different periods of time, the limited nature of the testimony of the DETROIT witnesses, and the fact that their period of observation differed only by a few months from the period of observation of the witnesses who personally appeared, renders the fact of differing time periods insignificant. For the same reasons, little benefit would accrue to the accused by presenting this repetitive testimony through the vehicle of live witnesses as opposed to stipulations as they ultimately were presented at trial. Thus, we conclude that the testimony of the DETROIT witnesses was "merely cumulative" with the evidence presented by the defense at trial through live witnesses and documentary evidence.

d. *The Availability of Alternatives to Live Testimony:* Stipulations of expected testimony were substituted for the live testimony of the DETROIT witnesses. For

the reasons stated above, we believe that stipulations were a viable alternative in this instance.

e. *Witness Availability, Amenability to Military Travel Orders, and Absence as Affecting Military Mission:* The fact that witnesses Vaca, Gebhardt, and Miller were all active duty members of the United States Navy and thus subject to military travel orders operates as a factor favorable to the appellant in his request for live production. The record of trial in this case does indicate, however, that the government did contact these witnesses and their commanding officer on the USS DETROIT in order to obtain an evaluation of their availability. Appellate Exhibit XII–2 consists of a message from the USS DETROIT to the Navy Legal Services Office in Yokosuka in response to this inquiry. That message describes the positions held by the three requested witnesses and goes on to state that "the absence of such key personnel cannot be allowed during the current forward deployed ops in the eastern Mediterranean supporting Sixth Fleet units." It is judicially noted that the Sixth Fleet was, at this time, conducting operations in support of the multinational peacekeeping force in Beirut. This militates against requiring their live testimony at the trial of appellant unless their appearance was so essential that its absence would severely prejudice the presentation of the accused's case.

■ Reviewing the factors discussed above, we find that the first two—the issues involved and the importance of the witnesses to those issues, and the fact that the requested witnesses were sought for their testimony on the merits as well as on sentencing—weigh in favor of requiring their personal appearance at trial. However, because of the cumulativeness of their testimonies, the availability of alternative methods of presenting their proposed testimonies and the effectiveness of those alternative methods in light of the testimony content, and the adverse effect that absence from their unit would have on military operations and an important military mission, their personal attendance at the trial of appellant was not required. Thus, we conclude that the military judge did not abuse his discretion in denying the appellant's motion for appropriate relief as it related to the request for defense witnesses Vaca, Gebhardt, and Miller.

2. *Carignan.* In his witness request to the convening authority dated 19 January 1984 (Attachment 4 to Appellate Exhibit XI), trial defense counsel averred that Personnelman Third Class Carignan worked with the appellant in the Disbursing Office at Building G–110 in Yokosuka, Japan from June 1981 until September 1982 and that he lived with the appellant in the Bachelor Enlisted Quarters (BEQ) from approximately October 1981 to September 1982. The following was defense counsel's summary of the witness's expected testimony:

He will state that he worked with JONES for approximately 8 hours a day, 5 days a week, and that during that period he never knew JONES to be involved in any manner with drugs; whether it be use, possession, or distribution. Also, PN3 CARIGNAN will testify that he socialized with JONES off duty as his roommate and as his friend, and never knew JONES to be involved in any drug activity at all as part of his social life. PN3 CARIGNAN will state further that he was in JONES' company often and had an opportunity to get to know him as an individual, and will say that JONES was opposed to drug use in the Navy. PN3 CARIGNAN will refute assertions by government witnesses that there were ever "drug parties" in the BEQ room where he, DKSN JONES, and YN2 WHITE lived together.

Defense counsel went on to state that "PN3 CARIGNAN is an essential defense witness on the merits of the general court-martial convened to hear DKSN JONES' charges." Appellate Exhibit 11, Attachment 4. In his stipulation of expected testimony, which the appellant was forced to enter into in light of the Government's refusal to grant his witness request, Personnelman Third Class Carignan testified

precisely as the appellant had asserted he would. Defense Exhibit H. Additionally, Carignan provided testimony with respect to the appellant's character for truthfulness. Carignan was attached to the USS REID which was homeported in Long Beach, California at the time of the witness request and trial. In denying the appellant's request for the personal appearance of this witness, along with other witnesses, the convening authority stated that "[t]heir potential testimony is not sufficiently material nor relevant with respect to the charges and specifications in this case to justify their presence and/or is cumulative with that of YN2 WHITE...." Appellate Exhibit XI, Attachment 7. In making a motion for appropriate relief at trial requesting that Carignan be made available for live testimony, trial defense counsel reiterated the witness's expected testimony and its importance to appellant's defense. After considering the briefs and arguments of counsel, the military judge denied the motion.

### The Tangpuz Factors

a. *Issues in the Case:* The appellant was found guilty of using and distributing methamphetamines to two individuals, Hawe and Jacobs, during the following two periods of time: 1 June to 30 September 1982, and 1 June to 30 June 1982. Trial defense counsel made a motion for a more particular statement with respect to the specification alleging a single transaction between 1 June and 30 September, but this motion was denied by the military judge. As stated above, because of the lack of physical evidence, the case was one which turned on the issue of the credibility of witnesses. The government presented two witnesses, the above-mentioned alleged distributees, who claimed to have personal knowledge of drug distribution on the part of the appellant.

When asked on direct examination how the typical methamphetamine transaction between her and the accused had occurred, Hawe answered that "[t]ypically it went during working hours in the G–110 building" and that sometimes it was accomplished simply by passing envelopes. On cross-examination, Jacobs was asked if the alleged transactions ever occurred in building G–110 where the appellant worked. She stated that "we probably talked about it in G–110 because it was the center of almost all the drugs." Thus, building G–110, which contained the disbursing office in which the appellant and his requested witness, Personnelman Third Class Carignan, worked together from approximately October 1981 until September 1982, became one of the focal points of the inquiry into the appellant's involvement with drugs. It would have been very beneficial to appellant's case to be able to present a witness who would have provided some insight into appellant's activities at and around his work area at building G–110.

Carignan's relationship with the appellant during and after work, the fact that this relationship covered the period of time during which the appellant was charged with using and distributing drugs, the fact that the evidence presented by the government alleged that this illegal activity occurred during work hours and in or near the work area, and the nonspecificity with which the illegal conduct was charged with respect to when it occurred, make Carignan and his assertion that the appellant "never involved himself in drugs of any sort" vitally important to the issues presented. We conclude that Carignan was a material and important witness in the presentation of the defense's case.

b. *Witness on the Merits or on Sentencing:* Carignan was requested for testimony on the merits.

c. *Cumulativeness of the Witness's Testimony:* Appellate government's position is that Carignan's testimony is cumulative to White's and therefore his personal attendance at the trial was unnecessary. White testified that he knew the appellant from March 1981 to March 1983 and that he was roommates with him from about April or May 1982 to September 1982. He stated that during the time that he lived and worked with the appellant, White nev-

er knew him to be involved with drugs of any kind. Although they worked in the same building, White did not spend much time with the appellant on a professional basis because they worked in different offices. Although the fact that White had been acquitted at his earlier trial of charges of methamphetamine distribution was never revealed at the Jones trial, numerous references to White's complicity in this type of activity, though not specifically elicited by trial counsel, were made during the testimonies of the government witnesses.

"Where the finding of guilt turned on the relative credibility of the witnesses and where, although the testimony which would be offered by the absent witness was expected to be similar to that of a witness who was present, the absent witness's credibility was greater, it was an abuse of discretion not to produce the defense witness." *United States v. Jouan*, 3 M.J. 136 (C.M.A.1977). "In a case in which the accused's entire defense rested on his credibility, the testimony of witnesses who knew him at different and succeeding periods of time in the military and whose testimony was limited to their observations and opinions accumulated during those different periods of time was not cumulative...." *United States v. Williams*, 3 M.J. 239 (C.M.A.1977). In arriving at a conclusion that the testimony of a witness requested on sentencing was not cumulative with one that had testified in person, the Court of Military Appeals in *Williams, supra,* stated:

> We pause to note that a trial judge, in ruling whether the testimony of a given witness would be "merely cumulative," must necessarily in his sound discretion decide whether, under the circumstances of a given case, there is anything to be gained from an additional witness saying the same thing other witnesses have said. Certainly, for instance, the fact that three people saw or heard the same thing and would render virtually identical testimony may be significantly more persuasive to a jury than if only one person were so situated. In other words, there

sometimes is an important impact to be expected from some repetitive testimony. The key is determining where and when to draw the line so as to assure an accused all the process he is due for a full and fair trial while at the same time assuring that the system is not abused by frivolous requests.

*Williams,* 3 M.J. 239 at 243, n. 8.

 Because of the taint placed on White's credibility by the numerous, albeit unsolicited, references to his drug activity, the fact that the requested witness Carignan was the appellant's roommate at a different time than White within the relevant period, and the fact that Carignan worked directly with appellant whereas White did not observe him daily on a professional basis, we cannot conclude that Carignan's testimony was "merely cumulative" with that of White. Furthermore, the facts peculiar to this case, and the important role played by the determination of the credibility of witnesses, mandated that this somewhat repetitive testimony be presented live in order to assure the accused a full and fair trial.

 d. *The Availability of Alternatives to Live Testimony:* Although normally "[a]n accused cannot be forced to present the testimony of a material witness on his behalf by way of stipulation or deposition," *Sweeney,* 34 C.M.R. 378 at 383, there are some circumstances under which "an accused may be properly compelled to stipulate to testimony if he desires to place a witness's evidence before the trier of fact." *United States v. Cover,* 16 M.J. 800, 802 (N.M.C.M.R.1983); *Tangpuz, supra; United States v. Scott,* 5 M.J. 431 (C.M.A. 1978). The ruling that alternatives to live testimony such as depositions, interrogatories, and previous testimony would be an adequate substitute for the personal appearance of a material witness must be read narrowly. The trial judge has the discretion to determine whether justice can be served by presenting a material witness's testimony in an alternative form to live testimony. "In exercising this discre-

tion, the judge must be scrupulous in assuring that the effect of the form of the testimony under the particular facts and circumstances of the case will not diminish the fairness of the proceedings." *Scott*, at 432.

A stipulation of expected testimony is the least desirable alternate form of presenting testimony. Unlike previous testimony, depositions, or interrogatories, it offers no basis whatsoever for the trier of fact to test the credibility of the witness. The most compelling form of this "test of credibility" is of course the vigorous cross-examination that a live witness is subjected to during the course of his or her personal appearance at trial. Not only is the substantive content of what the proponent has elicited challenged, but the trier of fact has a unique opportunity to observe the *demeanor* of a witness as he squirms in the face of obvious mistruths, or remains steadfast against what he considers to be an inappropriate insult to his integrity. Prior testimony, depositions, and interrogatories, while not presenting an opportunity to observe witness demeanor, at least allow inconsistencies in testimony to be brought out through adversary interrogation. Stipulations, on the other hand, involve no such tests of trustworthiness. An experienced trier of fact, such as a judge sitting alone, might be compelled to give minimum, if no, effect to a stipulation which he knows is more often gained through passive concession of what is perceived a harmless point rather than through active confrontation in the search for truth. A stipulation is acceptable as an alternative to live testimony where it accedes to a simple and uncontroverted issue of fact (*e.g.*, the opinion of a witness regarding an accused's character for honesty or the witness's knowledge of an accused's reputation for the same, or a witness's opinion that an accused was a hard worker while under his supervision). Where, however, a prospective witness's testimony goes to the very core of what is at issue in the case and may potentially, during cross and or re-direct examination, shed light on factual discrepancies which may assist the trier of fact in resolving the ultimate issue of guilt or innocence, it is not an acceptable alternative. We find that under the facts of the instant case, where the accused was charged with effecting a transfer of a controlled substance at some point during a lengthy and unspecified period of time, where the transfer was said to have taken place at the accused's workplace, where the requested witness was closely acquainted with the accused as a work associate and as a roommate for the same period of time during which the alleged transfer was to have taken place, and where the requested witness asserts that the accused was "never involved" in drugs, a stipulation of expected testimony was not a viable alternate method of presenting that witness's testimony.

e. *Other Factors—Witness Availability, Amenability to Military Travel Orders, and Absence as Affecting Military Operations or Mission:* In discussing the servicemember's right to compulsory process, the Court of Military Appeals has stated that they are "concerned with impressing on all concerned the undoubted right of the accused to secure the attendance of witnesses in his own behalf; the need for seriously considering the request; and taking necessary measures to comply therewith if such can be done *without manifest injury to the service*." *United States v. Manos*, 17 U.S.C.M.A. 10, 37 C.M.R. 274 (1967) (emphasis added). Assistance in deciphering what is meant by this phrase is obtained from the Court's discussion of the use of depositions. In discussing when, pursuant to Article 49(d)(2) of the UCMJ, "military necessity" may be used as the basis for using a deposition at trial in lieu of live testimony, the Court looked to the drafters of the Code: "[Military necessity] covers the situation where there is a witness subject to the code, or military personnel who are on such an important military mission, or by virtue of military operations, that it is impossible in performing their duty to also be at the place of trial." *United States v. Davis*, 19 U.S.C.M.A. 217, 41 C.M.R. 217, 223 (1970) (quoting Hearings before House Armed

Services Committee on HR 2498, 81st Congress, 1st Session, page 1070). Thus, the responsibility of the government to provide witnesses on the accused's behalf is not abdicated due to the inconvenience or cost to the government in having to produce those witnesses. *United States v. Willis,* 3 M.J. 94 (C.M.A.1977). Nor is the service's production of witnesses predicated on the distance of a prospective witness from the place of trial.[3] We conclude from the case law cited above that a military judge, in making a determination concerning the production of a military witness, must consider, as one of the factors along with those delineated in *Tangpuz,* whether or not the personal appearance of that witness can be accomplished without manifest injury to the service, *i.e.,* whether the servicemember's attendance at the trial will adversely affect the accomplishment of an important military mission or military operation.

In the instant case, there is nothing in the record of trial which indicates that witness Carignan was taking part in military operations or that he was on such an important military mission that the use of the extreme alternative of a stipulation of expected testimony would be justified. The record indicates, in fact, that Carignan was stationed aboard the USS REID which was homeported in Long Beach, California at the time of trial. There is no indication that the government made any effort at all to contact the witness's unit to determine his availability. *See United States v. Cover, supra.* The only explanation concerning his non-appearance is the convening authority's bald assertion that his testimony is neither "sufficiently material nor relevant with respect to the charges ... and/or is cummulative with that of YN2 WHITE...." Appellate Exhibit XI, Attachment 7. Such a niggardly approach to the accused's right to compulsory process cannot be tolerated and emasculates the type of trial envisioned by the framers of

the UCMJ. Using the standard of compulsory process that was used for determining whether witness Carignan's presence would be compelled would almost obviate the necessity of ever having to have live witness testimony at all. Stretching such a standard only slightly might allow us to try cases at docket meetings where the military judge, the trial counsel, and the defense counsel are all present, and where the written statements contained in investigative reports could be used in lieu of live testimony. The statutory right to compulsory process calls for a more meaningful standard. There being no evidence in the record to the contrary, since the government apparently made no attempt to obtain a determination of the witness's availability, we find that Carignan could have been provided as a witness without manifest injury to the service or without adversely affecting military operations or an important military mission.

■ In light of the conclusions we have reached above, we hold that the military judge improperly denied the accused's request for the defense witness Carignan and that such improper denial constituted an abuse of discretion under the facts of this case.

*Prejudice To The Appellant*

■ "An improper denial of a request for a defense witness is not an automatic ground for reversal of an otherwise valid conviction...." *United States v. Qualls,* 9 M.J. 662 (N.C.M.R.1980). "If error is found, we must then review the record of trial to determine whether there is any possibility that appellant was prejudiced because his conviction resulted from the improper denial of the motion." *United States v. Lucas,* 5 M.J. 167 (C.M.A.1978). We cannot say in the instant case, beyond a reasonable doubt, that the presentation of the live testimony of Carignan would not have "tipped the balance in favor of the

---

**3.** "Since a serviceman, subject to military orders, is always within the jurisdiction of the military court, we do not believe that he is *unavailable* simply because he is stationed more than one hundred miles from the situs of the trial. Something more is required." *Davis, supra* at 223.

accused." *Lucas, supra* at 172–173; *United States v. Ambalada,* 1 M.J. 1132 (N.C. M.R.1977). We conclude, therefore, that the appellant was prejudiced by the trial judge's abuse of discretion. Accordingly, we set aside the findings of guilty as to Specifications 3, 4, 7, and 8 of Charge III and the sentence and return the record of trial to the Judge Advocate General of the Navy for transmittal to the convening authority.

## III

### THE JENCKS ACT, 18 U.S.C. § 3500

▮▮▮ On 11 August 1983, the appellant was questioned, at the NIS office at Norfolk Naval Base in Norfolk, Virginia, regarding his alleged involvement in the distribution of methamphetamines in Yokosuka. Special Agent Simpson, the NIS officer in charge of the case, took notes while he and Special Agent Goodman, who was merely assisting Simpson, interviewed the appellant. During the one hour interview, the appellant made some incriminating statements, amounting to a confession, which he later averred were the result of improper coercion applied by the NIS agents. Upon the appellant's departure at the conclusion of the meeting, the agents immediately incorporated Simpson's "rough notes" into a results of interview which was, on the same or next day, typed up and signed by both agents. The handwritten notes of the interview were filed at the NIS resident agency in the Norfolk area and the case was closed. Shortly thereafter, Special Agent Simpson was transferred and one Special Agent McGuire took over his old cases, including the appellant's case. On approximately 12 November 1983, acting pursuant to his interpretation of the NIS policy regarding disposal of files at the expiration of the 90-day period following the closing of a case, McGuire destroyed the file containing the handwritten notes of the 11 August interview. The government's consequent inability to produce those handwritten notes is the basis for appellant's contention that the Jencks Act was violated and that, therefore, the

testimony of Special Agents Simpson and Goodman should have been suppressed pursuant to trial defense counsel's motion.

After hearing the testimony of Simpson and Goodman regarding the writing and content of the notes, their immediate incorporation into a results of interview, and their subsequent inadvertent destruction; and, after considering the briefs and arguments of counsel, the military judge denied the motion and entered the following essential findings of fact:

FIRST, that the notes in question were a statement within the meaning of the Jencks Act;

SECONDLY, they were in control of the government;

THIRD, the notes were destroyed in error without any devious intent or bad faith by the government;

FOURTH, they were not used in preparation for trial testimony;

FIFTH, they were incorporated into the results of interview within hours and the writings were compared for accuracy by Mr. Simpson and Mr. Goodman and then adopted by them as being accurate;

SIXTH, there has been no indication whatsoever, that there is any variation between the notes and the testimony of Simpson and Goodman;

SEVENTH, the notes had no apparent impeachment value;

EIGHTH, there is no apparent prejudice to the accused by the notes' destruction; and

NINTH, there has been a technical violation of the Jencks Act which was nonprejudicial and does not require any sanctions by this Court.

We agree with the military judge.

The Jencks Act, 18 U.S.C. § 3500, entitles the defense, upon completion of a government witness's testimony on direct examination, to the production of documents which are: (1) statements of the witness as defined by the statute; (2) in the possession of the government; and (3) related to the subject matter of the witness's testimony. The act applies to courts-martial. *United States v. Dixon,* 8 M.J. 149

(C.M.A.1979); *United States v. Heinel*, 9 U.S.C.M.A. 259, 26 C.M.R. 39 (1958).

In order to properly dispose of this issue, we must determine first whether the subject notes are producible statements within the meaning of the act. Written notes of a government agent made during interviews of witnesses or the interrogation of the accused are producible under the Jencks Act. *Dixon*, 8 M.J. 149; *United States v. Jarrie*, 5 M.J. 193 (C.M.A.1978); *United v. Bosier*, 12 M.J. 1010 (A.C.M.R.1982). Investigative agents such as Criminal Investigation Division (CID) or NIS agents are attached to the prosecutorial arm of the government, and their possession of statements, therefore, constitutes possession of that statement by the government for purposes of the Jencks Act. *United States v. Boyd*, 14 M.J. 703 (N.M.C.M.R.1982). We conclude that the notes taken by the NIS agents during their interrogation of the appellant were producible statements within the meaning of the Jencks Act.

While the Jencks Act obliges the government to produce certain documents when so requested by the defense, not every violation of that Act is prejudicial or requires a remedy. *Rosenberg v. United States*, 360 U.S. 367, 79 S.Ct. 1231, 3 L.Ed.2d 1304 (1959); *Dixon*, 8 M.J. 149; *Boyd*, 14 M.J. 703. In *Boyd, supra*, we determined that "[t]he imposition of sanctions for violations of the Jencks Act should turn on the particular circumstances of the case at bar and on a balancing of the potential prejudice to the accused and the Government's culpability." *Boyd*, at 705. Applying this balancing test to the relevant facts of the instant case, as detailed by the military judge in his essential findings, *supra*, we hold that sanctions for the government's technical violation of the Jencks Act in this case are inappropriate. This assignment of error, therefore, is rejected.

## IV

## PRODUCTION OF DRUG TREATMENT RECORDS OF GOVERNMENT WITNESSES

■ In a request for additional discovery dated 18 January 1984, trial defense counsel requested the government to provide the appellant with the medical records of two government witnesses, and with copies of all documents relating to their drug use and rehabilitative treatment therefor. Appellate Exhibit XIII, Attachment 2. The convening authority denied this request (Appellate Exhibit XIII, Attachment 4), but did provide documents to the defense relevant to the witnesses' drug use and treatment. Appellate Exhibit XIII, Attachments 5 and 6; Appellate Exhibit XIV.

At his trial, appellant raised a motion to compel production of the above mentioned health records and drug-rehabilitation related records of the witnesses. After considering the briefs and arguments of counsel, the military judge denied the motion. He left open the possibility of reconsidering the motion if the witnesses denied significant details of their drug involvement.

During their respective testimony, the witnesses readily admitted their drug problems and treatment for drug abuse. Based on the fact that there was no denial of drug involvement, the military judge again denied the motion upon its renewal by appellant. Appellant asserts before this court that the military judge's denials of his motions constitute prejudicial error. We disagree.

42 U.S.C. § 290ee–3, regarding the confidentiality of patient records in drug abuse rehabilitation programs, is applicable to the records requested by the appellant here. That statute provides that a drug rehabilitation patient's confidential records may be disclosed, without his consent, "if authorized by a court of competent jurisdiction after application showing good cause therefor." 42 U.S.C. § 290ee–3(b)(2)(C). The statute directs the court, in assessing good cause, to "weigh the public interest and the need for disclosure against the injury to the patient, to the physician-patient relationship, and to the treatment services." *Id.* We believe that the military judge weighed the competing interests correctly in the instant case.

Although there is no military case law on the issue of whether confidential drug rehabilitation records of a government witness should be released in order to assist the defense in its attack on that witness's credibility, there are two New York state decisions addressing this issue. In *Commissioner of Social Services of City of New York v. David R.S.*, 55 N.Y.2d 588, 451 N.Y.S.2d 1, 436 N.E.2d 451 (1982), a putative father in a paternity proceeding sought disclosure of the natural mother's treatment at a drug abuse treatment center in order to attack the credibility of the mother's testimony. In determining that the showing of "good cause" was insufficient to direct disclosure by court order in accordance with the dictates of the federal statute (the treatment center was assisted by a federal agency), the court held that the preservation of the confidentiality of the records was dictated by the substantial interests of the mother and the treatment centers in the protection against disclosures which might deter their participation. In a case more similar to the case at bar, it was held that the drug treatment records of a parent were not subject to being produced in a child neglect proceeding for the purpose of impeaching the parent's credibility when the fact of drug use has already been disclosed, even though the records would be more probative evidence of the facts already adduced. *Matter of Stephen F.*, 118 Misc.2d 655, 460 N.Y.S.2d 856 (Fam.Ct.1982). We hold that in the instant case, where the government witnesses readily admitted their involvement in drug abuse and in rehabilitation programs, thus minimizing the value of their treatment records for impeachment purposes, the public interest and the possibility of injury to the patient and to the treatment program are considerations which weigh in favor of preserving the confidentiality of the treatment records. This assignment of error, therefore, is rejected.

Accordingly, the findings of guilty to Charge I and its single Specification are affirmed. The findings of guilty to Charge III and Specifications 3, 4, 7, and 8 thereunder and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Navy for transmittal to the appropriate convening authority. A rehearing may be ordered.

KERCHEVAL and BARR, JJ., concur.